THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| In re: <br><br> SKELAXIN (METAXALONE) ANTITRUST LITIGATION <br><br> THIS DOCUMENT RELATES TO: <br><br> **All Indirect Purchaser for Resale Actions** | Lead Case No. 2:12-cv-4 <br><br> MDL Case No. 1:12-md-2343 <br><br> Judge Curtis L. Collier <br><br> Magistrate Judge William B. Mitchell Carter |

Memorandum and Order

I. Introduction

This matter comes before the undersigned Magistrate Judge on motion of the Indirect Purchaser Plaintiffs for Resale (IPPs) to compel King Pharmaceuticals, Inc.'s responses to the IPPs' Third Request for Production of Documents. [Case No. 1:12-md-2343, Doc. 385][1]. King Pharmaceuticals, Inc. (King) has objected to certain document requests on the grounds that the information they seek is irrelevant and unduly burdensome to produce. The IPPs counter that the information they seek is relevant to the question of whether King's alleged anticompetitive conduct has had substantial effects on Tennessee commerce within the meaning of the Tennessee Trade Practices Act (TTPA). The IPPs also observe that King has not come forward with an affidavit or any form of evidence to support its claim that production in response to the document requests would be overly burdensome. The undersigned agrees with the IPPs, and the motion to compel is GRANTED.

---

[1] All references to document numbers in this memorandum and order will be in Case No. 1:12-md-2343.

1

## II. Background

The IPPs bring their actions against King under the TTPA, Tenn. Code Ann. § 47-25-106, which provides a civil remedy against those who violated the TTPA. The TTPA prohibits "price fixing agreements that tend to affect the price to the 'producer or consumer' of such products." *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 517 (Tenn. 2005) (citing Tenn. Code Ann. §§ 47-25-101 and 102.) The "purpose of the TTPA is to protect the state's trade or commerce affected by the anticompetitive conduct." *Id.* at 522. Under the TTPA, "an indirect purchaser may recover from the antitrust violator the amount of the overcharge that the direct purchaser passed on to the indirect purchaser." *Id.* at 518 (citing Tenn. Code Ann. § 47-25-106.) The TTPA does not limit recovery to indirect purchasers who are residents of Tennessee; under certain circumstances, nonresidents may also recover under the TTPA. *Id.* at 517. However, in order for a case to fall within the scope of the TTPA, whether the indirect purchasers are residents or nonresidents of Tennessee, the alleged anti-competitive conduct must substantially affect Tennessee trade or commerce. *Id.* at 532.

As the IPPs note, King sought to have their claim brought under the TTPA dismissed for failure to plead sufficient facts to show its conduct substantially affected Tennessee trade or commerce. The district court, however, denied the motion to dismiss the IPPs' TTPA claim stating:

> Viewing the facts at this stage in the light most favorable to the Indirect Purchaser Plaintiffs, the complaint adequately alleges the Indirect Purchaser Plaintiffs paid possibly hundreds of millions of dollars in overcharges and--even taking into account other entities in the chain of production such as the wholesaler and supplier--King most likely received a significant portion of the sales. Moreover, given that King conducted business out of Tennessee, the Court can reasonably infer that a substantial portion of that money flowed back to Tennessee. Finally, taking the Indirect Purchaser Plaintiffs' allegations as true regarding the nature of the agreement between King and Mutual, it is also plausible that some or all of the money that went toward Mutual to further

2

Defendants' anticompetitive scheme had the effect of depriving the state of Tennessee of additional funds. All of these acts would have affected intrastate commerce.

(May 20, 2013 opinion, Doc. 200, Page ID # 7262).

To date, King has provided the IPPs with "comprehensive, transaction specific data on all of King's Skelaxin sales from January 1, 2003 to present" including data regarding rebates, charge backs and discounts for Skelaxin transactions and production data sufficient to show profits and losses for Skelaxin from 2005 to 2012. (King's Response, Doc. 406, Page ID # 14972).

### III. Analysis

The IPPs assert the requests at issue seek information relevant to the issue of whether King's alleged anti-competitive conduct has substantially affected Tennessee trade or commerce. At issue are two groups of document requests: one seeking certain financial data concerning the flow of money into or out of Tennessee from King and, second, requests seeking various Tennessee state and local tax filings made by King between January 1, 2005 and the present.

**1. Document Requests 1(a), (e) – (h)**

These requests seek specific financial data from King, including documents sufficient to show total revenues, total compensation paid to Tennessee-based employees, total payments to third parties located in Tennessee, and total contributions to political and charitable organizations located in Tennessee from January 1, 2005 to present. The IPPs explain their relevance as follows:

> This financial data is relevant to the substantial effects inquiry, as Judge Collier explained, inasmuch as it is needed to determine the extent to which "a substantial portion of [the Skelaxin money] flowed back to Tennessee." *Skelaxin*, 2013 U.S. Dist. LEXIS 70968, at *82-83. Specifically, IPPs need these documents to determine the amount of money that flowed through Tennessee's commerce as a result of King's anticompetitive conduct. While King is unlikely to possess documents that, on their face, trace the flow of money from sales of Skelaxin through Tennessee trade or commerce, IPPs intend to perform a straightforward analysis of the issue: first, IPPs will determine the percentage of King's total revenues attributable to Skelaxin, and second, IPPs will apply this percentage to payments made by

3

King in Tennessee, including for compensation of Tennessee employees, payments to Tennessee vendors, and remittance of taxes to state and local governments in Tennessee.

(IPPs' brief at 7, Page ID # 14709-10).

**2. Document Requests 1(i) and 2(a)-(d)**

These requests seek Tennessee state and local tax filings made by King between January 1, 2005 and the present. The IPPs explain their relevance as follows:

> These tax filings are relevant, as Judge Collier wrote, to the substantial effects inquiry inasmuch as "some or all of the money that went toward Mutual to further Defendants' anticompetitive scheme had the effect of depriving the state of Tennessee of additional funds," thereby impacting Tennessee commerce. *Skelaxin*, 2013 U.S. Dist. LEXIS 70968, at *82-83. Specifically, IPPs need these documents, together with the other documents subject to this Document Request, to extrapolate the amount of tax revenue either gained or lost by the State and localities as a result of King's anticompetitive conduct.

(IPPs' brief at 9, Page ID # 14711).

There does not seem to be any specific formula for showing that alleged anticompetitive conduct substantially affects Tennessee commerce. As the Tennessee Supreme court stated in *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 523 (Tenn. 2005), "[t]he determination of whether an effect is substantial does not involve 'mathematical nicety.' Rather, the test is pragmatic, turning upon the particular facts of the case. The anti-competitive conduct, however, need not threaten the demise of the Tennessee businesses or affect market prices to substantially affect intrastate commerce." (Internal citation omitted).

Given this pragmatic approach to the "substantial effect" determination, the undersigned concludes the requested information is relevant to the "substantial effect" issue. Moreover, because King only generally avers that such discovery would be unduly burdensome without providing an affidavit in support which includes specific facts to support the burdensome argument, the undersigned rejects this argument as well.

4

## IV. Conclusion

Accordingly, the IPPs' motion to compel answers to their Third Request For Production of Documents is GRANTED.  It is further ORDERED that King shall provide the requested documents within FORTY-FIVE DAYS from the date of entry of this order.

SO ORDERED.

ENTER.

S /*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE