UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

In re:                                     )
                                           )
                                           )    Case No. 1:12-md-2343
Skelaxin (Metaxalone) Antitrust Litigation )
                                           )
                                           )    Judge Curtis L. Collier

# M E M O R A N D U M

Before the Court are two motions for class certification in this pharmaceutical antitrust case.[1]

Plaintiffs Johnson's Village Pharmacy, Inc.; Russell's Mr. Discount Drugs, Inc.; Knight Pharmacy,

Inc.; and Bidwell Pharmacy & Medical Supply, Inc. seek certification of an Indirect Purchaser Class

("Indirect Purchasers") (Court File No. 158).   Plaintiffs United Food and Commercial Workers

Union and Midwest Health Benefits Fund; Pirelli Armstrong Retiree Medical Benefits Trust; Allied

Services Division Welfare Fund; Plumbers and Pipefitters Local 572 Health and Welfare Fund;

Laborers Trust Fund for Northern California; and Louisiana Health Service Indemnity Company

seek certification of an End Payor Class ("End Payors") (Court File No. 167).   Defendants King

Pharmaceuticals LLC's ("King") and Mutual Pharmaceutical Company, Inc. ("Mutual")

(collectively, "Defendants") filed memoranda opposing certification of both classes (Court File Nos.

252, 281), to which both classes replied (Court File Nos. 338, 359).[2]   On November 15, 2013, the

---

[1] Another putative class of direct purchasers had also filed a motion for class certification. On the eve of the November 2013 hearing, however, the direct purchasers and Defendants informed the Court they had reached a potential settlement and requested the Court stay any consideration of the pending motion for class certification until the settlement was finalized.   Accordingly, the Court does not discuss this motion.

[2] Defendants filed a motion for leave to file a surreply, but the motion was in fact the surreply brief itself (Court File No. 382).   Indirect Purchasers and End Payors opposed the motion (Court File

Court heard oral argument on these motions. Counsel for all moving parties were present and were well prepared. As was the case with respect to the motion to dismiss, the Court found oral argument helpful to the resolution of these motions and commends counsel for their performance.

For the following reasons, the Court will **DENY** both motions for class certification (Court File Nos. 158, 167). With respect to End Payors, the Court concludes they have failed to demonstrate the proposed class is ascertainable. Given the discrepancy between End Payors' expert's testimony and the class definition, the Court cannot determine which entities or individuals are members of the class and which are not. It appears this determination may require a transaction-by-transaction inquiry, which would be inconsistent with a class action. Moreover, even were the Court to consider End Payors' class definition at face value, recent Supreme Court precedent could preclude certification. The class definition also poses problems of typicality and adequacy of representation that counsel against class treatment.

With respect to Indirect Purchasers, the Court concludes they have failed to make an adequate choice-of-law showing. Tennessee law does not apply to a nationwide class regardless of the fact that the statute at issue may be available to nonresidents in certain situations. Moreover, Indirect Purchasers have failed to contend with Defendants' argument against certification of their alternative state subclasses. Having failed to meet their burden, the Court will not grant Indirect Purchasers' class certification motion.

End Payors have also filed a motion for partial summary judgment and a motion to strike

---

Nos. 403, 404). The local rules specifically state that "[n]o additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without *prior* approval of the Court." E.D. Tenn. L.R. 7.1(d) (emphasis added). The Court will reluctantly **GRANT** the motion given that the brief has already been filed. The Court cautions the parties that it will not look kindly upon further disregard of the local rules.

expert testimony regarding Defendants's "pass on" defense (Court File Nos. 354, 356). Because the Court declines to certify the class, the Court will **DENY WITHOUT PREJUDICE** these motions (Court File Nos. 354, 356). Individual end-payor plaintiffs may raise these issues in subsequent dispositive motions particular to the facts and state law relevant to their respective cases.

## I.      RELEVANT BACKGROUND

The Court discussed in considerable detail the extensive factual allegations involved in this case when it denied Defendants' motion to dismiss (Court File Nos. 200, 201). In brief, this case involves a number of plaintiffs who purchased Skelaxin, a brand name for the muscle relaxant metaxalone. The chief factual basis for liability is that Defendants colluded to delay the entry of a generic drug on the market. The plaintiffs in this case thus seek compensation for the amount they were charged for Skelaxin in excess of the amount they would have been charged for a generic alternative had such an alternative been developed and marketed. In January 2012, one of these cases was filed in the Eastern District of Tennessee. After a number of successive cases were filed, the Multidistrict Litigation Panel transferred the cases to this district and they were consolidated before the Court. Defendants filed a motion to dismiss the complaints in this case, which the Court denied after considerable briefing and oral argument. Many of the plaintiffs are proceeding as putative classes and those motions are ripe for resolution in this memorandum and its accompanying Order.

The Court will discuss each motion separately and provide further background relevant to those motions below.

## II.     STANDARD OF REVIEW

"To be certified, a class must satisfy all four of the Rule 23(a) prerequisites—numerosity,

commonality, typicality, and adequate representation—and fall within one of the three types of class actions listed in Rule 23(b)." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012); *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(b)(3), which provides,

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied and, in addition . . .
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>> (D) the likely difficulties in managing a class action.

A district court enjoys broad discretion in certifying class actions, but must exercise this discretion within the framework of Rule 23. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). "[T]he district court should not merely presume that the plaintiffs' allegations in the complaint are true for the purposes of class motion without resolving factual and legal issues." *Young*, 693 F.3d at 537. However, "it 'is not always necessary to probe behind the pleadings before coming to rest on the certification question, because sometimes there may be no disputed factual and legal issues that strongly influence the wisdom of class treatment.'" *Id.* (quoting *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012)). Recent Supreme Court precedent has clarified that "some inquiry into the merits may be necessary to decide if the Rule 23 prerequisites are met." *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (citing *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184,

4

1194–95 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)). However, if the Court is so required, it must only look into "those matters relevant to deciding if the prerequisites of Rule 23 are satisfied. . . . [and] may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'" *Id.* at 851-52 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).

The Court is required to conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met before certifying a class. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998); *In re Am.*, 75 F.3d at 1078-79. The plaintiff has the burden of showing that all of the requirements for class certification have been met. *In re Am.*, 75 F.3d at 1079. For purposes of certifying a class in a class action, mere repetition of the language governing the federal rule is not sufficient; there must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled. *Id.*

## III.   DISCUSSION

### A.  End Payors

#### 1. Class Definition

End Payors propose two separate classes: a damages class and an injunction class. The damages class is further split into three subclasses.

##### i. Damages Class

The damages class is defined as follows.

All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Skelaxin and/or its AB-rated generic equivalents in Arizona, Arkansas, California, Florida, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, Tennessee, Virginia, West Virginia, or Wisconsin, in any form, for consumption by themselves, their families,

5

or their members, employees, insureds (including their insureds' members, participants, or beneficiaries),[3] participants, or beneficiaries, other than for resale, during the period November 4, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease. For purposes of the Class definition, persons or entities "purchased" Skelaxin or its generic equivalent if they paid or reimbursed some or all of the purchase price.

The primary distinction between this class and the other classes is that the class is limited to entities and individuals who purchased Skelaxin *for consumption* and *other than for resale*. Thus the name "end payor" targets entities and individuals who finally purchased the Skelaxin through a wholesaler or other indirect purchaser for their own use and by logical extension were the final consumers who absorbed the overcharge passed along the distribution chain.

### a. Antitrust Damages Subclass

The Antitrust Damages Subclass is defined as:

All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Skelaxin and/or its AB-rated generic equivalents in Arizona, California, Florida, Kansas, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, Tennessee, West Virginia, or Wisconsin, in any form, for consumption by themselves, their families, or their members, employees, insureds (including their insureds' members, participants, or beneficiaries), participants, or beneficiaries, other than for resale, during the period November 4, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Skelaxin or its generic equivalent if they paid or reimbursed some or all of the purchase price.

End Payors suggest this subclass is designed to encompass the end payors who purchased Skelaxin in the fifteen states above, which have state law antitrust liability statutes.

### b. Unfair and Deceptive Trade Practices Subclass

---

[3] At the hearing on these motions, End Payors indicated they wished to include this parenthetical clause in the class definition. The Court assumes it was also meant to be included in each of the damages subclasses and has included them accordingly. The inclusion of this parenthetical has no effect on the Court's decision discussed in this memorandum.

6

The Unfair and Deceptive Trade Practices Subclass is defined as:

All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Skelaxin and/or its AB-rated generic equivalents in Arkansas, California, Florida, Massachusetts, Minnesota, Missouri, Nebraska, Pennsylvania, Rhode Island, or Virginia, in any form, for consumption by themselves, their families, or their members, employees, insureds (including their insureds' members, participants, or beneficiaries), participants, or beneficiaries, other than for resale, during the period November 4, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease. For purposes of the Class definition, persons or entities "purchased" Skelaxin or its generic equivalent if they paid or reimbursed some or all of the purchase price.

End Payors state this subclass is directed at end payors who purchased in these ten states, which have unfair trade practices and consumer protection laws on the state level.

### c. Unjust Enrichment Subclass

The Unjust Enrichment Subclass is defined as:

All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Skelaxin and/or its AB-rated generic equivalents in Arizona, Arkansas, California, Florida, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, Tennessee, Virginia, West Virginia, or Wisconsin, in any form, for consumption by themselves, their families, or their members, employees, insureds (including their insureds' members, participants, or beneficiaries), participants, or beneficiaries, other than for resale, during the period November 4, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease. For purposes of the Class definition, persons or entities "purchased" Skelaxin or its generic equivalent if they paid or reimbursed some or all of the purchase price.

End Payors state this subclass is directed at any end payor who purchased in the twenty-one states which recognize unjust enrichment claims in this context.

### d. Exclusions

The following groups are excluded from the Damage Class and all subclasses:

a.      Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal government entities, except for

7

government funded employee benefit plans;

b. Fully insured health plans (i.e., plans that purchased insurance from another third party payor covering 100% of the Plan's reimbursement obligations to its members);

c. "Flat co-payor" consumers whose plans at the time of purchase would have required them to make the same fixed dollar co-payment amount for Skelaxin as for generic metaxalone;

d. Consumers who had only generic metaxalone purchases, all pursuant to a fixed co-pay;

e. End-payors who acquired Skelaxin or generic metaxalone solely through a Prison or Federal Facility or through a Clinic defined as a cancer treatment facility; outpatient clinic; dialysis, urology or nephrology center; X-ray radiology, and nuclear diagnostic facility; surgicenter; free-standing emergicenter; or family planning center;

f. Consumers who only purchased or received Skelaxin or generic metaxalone through a Medicaid program; and

g. Consumers who bought only branded Skelaxin (and not generic metaxalone) after generic metaxalone became available under a health or drug plan pursuant to which they paid a co-pay or co-insurance amount.

### ii. Injunction Class

The Injunction Class is defined as:

All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Skelaxin and/or its AB-rated generic equivalents, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, during the period November 4, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease. For purposes of the Class definition, persons or entities "purchased" Skelaxin or its generic equivalent if they paid or reimbursed some or all of the purchase price.

The injunction class is the only one of the proposed end payor classes proceeding under federal antitrust law. Defendants have not responded to End Payor's motion on this ground and appear not to dispute the validity of this class.

### 2. Expert Reports

The parties have submitted a number of expert reports regarding the proposed class.

### i. Dr. Rausser

8

End Payors submitted the declaration of Dr. Gorden Rausser (Court File No. 435, Rausser Decl.). Dr. Rausser analyzed the proposed class definitions and concluded it was composed of three types of payors: cash-paying consumers without insurance; consumers who split the cost of the drug with an insurer, health plan, Medicare or Medicaid, and paid a co-payment; and so-called "Third Party Payors" ("TPPs"), or entities such as insurers or health plans that pay a portion of the price of a drug for their beneficiaries. Dr. Rausser considered the number of potential class members, discussed whether it is plausible Defendants could cause antitrust injury, and calculated class-wide damages. When analyzing these issues, Dr. Rausser relied upon data from IMS Health Services, Inc., "the standard provider of pharmaceutical marketing and sales data" used in the industry (*id.* at ¶ 17). He looked to two types of data, one that focused on sales data from manufacturers and wholesalers and one that looked to sales data on the retail level. Dr. Rausser also considered data provided by Blue Cross Blue Shield of Louisiana, Defendant King, and by CorePharma. Finally, Dr. Rausser considered general literature and publications discussing generic competition.

Dr. Rausser concluded that each End Payor class is composed of numerous class members (*id.* at ¶ 67). He notes over 300,000 Skelaxin prescriptions were filled in January 2007 alone, which resulted in an equivalent number of class members. He also notes some 12,000 self-insured health plans existed in the United States in 2008. Dr. Rausser also concluded that the delayed generic entry in this case had a market impact (*id.* at ¶¶ 94-95). He compared Skelaxin to other drugs with generic alternatives, as well as to the actual data available from the allegedly delayed launch of generic metaxalone,

Dr. Rausser also concluded the class members suffered common antitrust impact. Dr. Rausser analyzed sales data and concluded "prices for Skelaxin and generic metaxalone were

9

relatively uniform regardless of the sales channel through which the purchase was made" (*id.* at ¶ 97). Dr. Rausser first analyzed retail-level purchasers including purchases from retail stores and pharmacies with long term care facilities. He also looked at data from wholesale channels. The price differences between these channels were low, some 1% for Skelaxin and between 4 and 7% for the generic alternatives.

Dr. Rausser looked to the division of the impact between TPPs and consumers. He noted "[t]he consumer's share of the drug cost takes the form of either a co-pay (a specified fixed dollar amount per prescription) or co-insurance (a specified percentage of the drug price)" (*id.* at ¶ 111). For these insured consumers, he concludes "nearly all insured consumers pay more for brand drugs than for generic drugs, and [] the rate at which consumers would have switched from the brand to the generic would have been rapid, leaving few brand sales" (*id.* at ¶ 113). The only insured consumers who would not have been harmed by generic delay are flat co-pay consumers, but they are excluded from the class definition (*id.* at ¶ 118).

With respect to TPPs, "all or virtually all third-party payors would have been harmed by the Defendants' alleged anticompetitive conduct" (*id.* at ¶ 120). Dr. Rausser sought to determine the impact suffered by TPPs in the but-for world (as in, but-for the anticompetitive conduct). Dr. Rausser estimated "(1) the rate of conversion from Skelaxin to its generic equivalent in the but-for world and (2) the price of the generic equivalent in the but-for world." He first considered whether it was possible that TPPs would have such high manufacturers rebates that they would not pay any portion of the overcharge. Dr. Rausser computed "extreme values" of rebates to determine whether it was possible a class member did not suffer antitrust impact. He concluded that under multiple scenarios virtually all TPPs suffered some harm.

Dr. Rausser then calculated class-wide damages.[4] Dr. Rausser assumed "[t]he amount of damage suffered by the Proposed Class is equal to the difference between what Members of that Class paid for branded Skelaxin or generic metaxalone, and what they would have paid with unimpaired access to generic equivalents" (*id.* at ¶ 128). Dr. Rausser used a "credible and conservative" generic entry scenario to determine when a generic would have entered the market. He also used the actual volume of Skelaxin and metaxalone to compute the sales volume in his scenario. He relied upon King's own projections of how generic prices would decline after generic entry. Dr. Rausser contends the model could be adjusted easily given a determination on any number of inputs, including date of entry, number of generic competitors, and more.

Additionally, Dr. Rausser discusses unjust enrichment damages as "the degree to which Defendants' profits were artificially enhanced due to unlawful conduct" (*id.* at ¶ 147). Dr. Rausser used the previously discussed damages model to compute "the difference between the number of Skelaxin pills sold in the actual world and the quantity that would have been sold in the but-for world, and the difference in the price that would have been charged for those branded pills" (*id.*). Dr. Rausser did not yet compute the estimated damages, but contends it is possible.

### ii. Dr. Hughes

Defendants retained their own expert, Dr. James Hughes, who submitted a declaration regarding the obstacles to class-wide resolution (Court File No. 282, Hughes Decl.). Dr. Hughes points to the many varied contractual links among class members who will have claims to all or part of the alleged damage in any individual transaction. Because resort to these contracts is necessary

---

[4] Dr. Rausser submitted an amended damages computation that differed slightly from his original (Court File No. 236).

to determine the incidence of injury and alleged damages for each transaction, class-wide resolution is nearly impossible. Moreover, Dr. Rausser has calculated class-wide damages based on an averaging methodology that ignores the fact that many consumers have deductibles, out-of-pocket maximums, plan maximums, and other contractual provisions that may eliminate or alter the injury suffered on any given transaction. He also states many so-called TPPs who are members of the class "pass on" the overcharge and so suffer no injury.

In order to understand Defendants's argument, Dr. Hughes explains the characteristics of some of the entities who would be members of the proposed class. The class includes pharmacy benefit managers ("PBMs"), insurers, health and welfare plans, and consumers.

Dr. Hughes describes the "flow of payment" for prescription drugs as follows. Although "cash payors"–individuals who purchase drugs without health insurance–actually pay for the entire cost of the drug, insured individuals are part of a complex structure of payments. TPPs will pay a portion (if not all) of the price, typically leaving the insured with a co-pay. Who paid a portion of the price and to what degree is varied and requires consideration of each individual contract between the TPPs and individuals as well as contracts between TPPs and retailers or manufacturers. He provides the following chart to demonstrate the flow of payment.

Case 1:12-md-02343-CLC-WBC   Document 508   Filed 01/30/14   Page 12 of 66   PageID #: 17483



**Payment Flows for Skelaxin for an Insured Consumer**



Source: "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain," Prepared for The Kaiser Family Foundation by: The Health Strategies Consultancy LLC, March 2005; "How Private Health Coverage Works: A Primer, 2008 Update," The Kaiser Family Foundation, April 2008.

Note: Some payment flows unrelated to End-Payor Plaintiffs (EPP) have been omitted. Wholesalers are part of the alleged Direct Purchaser Plaintiffs' class (DPP), and retail pharmacies are part of the alleged Indirect Purchaser for Resale Plaintiffs' class (IPP). In general, rebates are more commonly paid for brand than for generic drugs. However, as demonstrated in "Rebates_metaxalone" from Sandoz Production, Sandoz appears to have paid rebates to wholesalers and others for generic metaxalone in this case.

(Court File No. 282, Hughes Dec., ¶ 18)

A plan sponsor is an organization, such as an employer, organization, or health and welfare plan, that provides benefits to its employees or members (*id.* at ¶ 21). Five of the six named End Payor plaintiffs are plan sponsors. Plan sponsors may fund these plans in varied ways, such as splitting the cost among employees or members or doing so pursuant to a collective bargaining agreement. These plan sponsors will then contract with commercial insurers or PBMs for benefits, including prescription drug insurance. Again, these contracts vary per entity and plan sponsor. They may be fully insured, self insured, or a hybrid. The fully insured plans require a premium payment to an insurer or PBM for prescription drugs (*id.* at ¶ 22). Self-insured plans, however, often involve a commercial insurer or PBM administering the claims between a plan sponsor and a PBM or insurer at a contractually agreed price (*id.* at ¶ 23). These arrangements are called administrative services only ("ASO"). A plan sponsor may also use a hybrid system of these two options.

13

A commercial insurer collects premiums used to cover the cost of providing medical coverage. They may also engage in ASO agreements whereby they are paid an agreed price for each prescription. Dr. Hughes states that commercial insurers often bundle these ASO plans with "stop-loss insurance" which allows the plan to avoid the risk of exceeding the costs of the plan.

PBMs are more commonly being used in the United States now, managing more than 70% of prescriptions dispensed in 2009 (*id.* at ¶ 29). PBMs sometimes act in an ASO capacity where they accept an agreed payment for facilitating the dispensing of drugs. PBMs will often negotiate prices with retail pharmacies, charging insurers or plans more than they paid for the drugs to obtain profit. PBMs also negotiate rebates with manufacturers and will then pass some of that rebate on to insurers or plans.

Finally, consumers often pay a fixed dollar amount, such as a co-pay, or a percentage of the total cost of the drug. Moreover, these payments are affected by deductibles, annual benefit maximums, and out-of-pocket maximums.

Based on this structure, Defendants' position is that insurers never bear the brunt of pharmaceutical prices because of increased premiums and increased contribution rates. According to Defendants' expert, John Fritz, actuaries calculate the premium necessary to cover the claims made in the preceding year, which includes the actual cost of reimbursing covered drugs (Court File No. 283, Fritz Decl, ¶¶ 1-3). Accordingly, drug prices from one year are incorporated into the following year's premiums. The actuaries will then project changes in price and estimate future events, setting premiums at a level sufficient to cover projected claims and to obtain profit. Defendants argue, therefore, that insurers never bear the burden of the higher cost for a branded drug, as it is factored into their premiums. Defendants argue health and welfare plans also pass on

14

the cost of drugs.

### iii. John Fritz

John Fritz, an actuary, provided a declaration claiming insurance companies are not harmed by higher drug prices (Court File No. 283, Fritz Decl.). He states insurers "price their premiums to account for the projected costs of all drugs, brand and generic prescription drugs, and thereby pass on these costs to their customers through the premiums that they set and charge" (*id.* at ¶ 1). Because insurers set their premiums to cover expected claims and costs plus a profit margin, the higher past costs are, the higher premiums will be (and the lower costs are, the lower premiums will be). Insurers use actuarial models to calculate premiums and estimate "trend factors," including drug price inflation and anticipated generic launches. Because they "re-price" annually, insurers can correct "misses" from the previous year's projections, insurers' premiums include the actual costs of reimbursing claims for brand Skelaxin. Accordingly, regardless of when the generic hits the market, insurers would have lowered premiums anticipating the generic entry. Although Dr. Rausser concluded that the impact of generic metaxalone would have been too de minimis to affect premium prices, Fritz concludes the effect would have been about $1.10 a year for individuals and $3.02 a year for a family, and premiums would have been responsive to this change (*id.* at ¶ 7).

And even if the insurer had not anticipated generic entry, the drug cost may be higher in the first year after generic entry than it was before: the generic would not have a significantly lower cost in the first year than the branded drug, insureds pay lower co-pays, and insurers lose manufacturers rebates. Therefore, the insurer would not have suffered injury from delay of the generic. Moreover, because the overhead expense is a percentage of the premium, and brands contribute more to an insurer's profit margin, brand drugs cover *more* fixed costs than do generic

drugs.  Fritz thus concludes generic entry will harm insurers, and estimates Blue Cross Blue Shield of Louisiana, one of the named End Payor plaintiffs, likely made $148,000 extra a year off of branded Skelaxin.

### iv. Rausser Rebuttal

Dr. Rausser also offered a rebuttal declaration (Court File No. 364, Rausser Reb.)  Dr. Rausser agrees with Dr. Hughes that "[t]he economic burden of each overcharge for Skelaxin or metaxalone is borne either by the consumer alone or, in the case of insured consumers, by the consumer and its third-party payor [] that shares part of the cost" (*id.* at ¶ 3).  He sees it, however, as a damages allocation problem.  Moreover, Dr. Rausser states that Defendants misinterpret the class definition, including entities that are not end payors.

Dr. Rausser also responds to Fritz's conclusion some TPPs would suffer no injury or even be harmed by generic entry.  Dr Rausser concludes (1) most of these types of entities are not "end payors" because they are "intermediaries" or specifically excluded; (2) the few remaining such entities or individuals are likely no more than 0.7% of transactions; and (3) even in extreme circumstances, virtually all TPPs suffer economic injury.

And overcharge, not lost profits, is the proper damage calculation because TPPs share the final cost in a final end purchase to consumers.  TPPs are not intermediaries and so do not pass through the drug cost to consumers.  He also concludes "[a]s a matter of economics" the place of purchase is the location of the overcharge.

### 3. Damages Class

### i.  Class Definition

"Before the Court may certify a class pursuant to Rule 23, 'the class definition must be

sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" *Young*, 693 F.3d at 537-38 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, ¶ 23.21[1] (3d ed.1997)). Furthermore, the identity of class members must be ascertainable by reference to objective criteria. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012) ("[A] class must be sufficiently definite that its members are ascertainable."); *Garrish v. United Auto., Aerospace, & Agric. Implement Workers of Am.*, 149 F. Supp. 2d 326, 331 (E.D. Mich. 2001) (citing *Crosby v. Social Security Admin.*, 796 F.2d 576, 580 (1st Cir. 1986)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593; *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 45 (2d Cir. 2006) ("Although it has been stated that class members must be ascertainable 'at some point in the case,' but not necessarily prior to class certification, we point out the need for numerous individualized determinations of class membership in order to provide further support for our basic conclusion that individual questions will permeate this litigation.") (internal citation omitted). A precise definition allows the Court to determine who would be entitled to relief, who would be bound by a judgment, and who is entitled to notice of the action. Similarly, some courts have recognized several "important objectives" of ascertainability: (1) it eliminates administrative burdens "incongruous with the efficiencies expected in a class action"; (2) it facilitates the best notice possible to protect absent class members; and (3) "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Marcus*, 687 F.3d at 593.

The Sixth Circuit, for instance, has rejected class definitions in which "the only way to

distinguish between the two sets of individuals [one of which is in the class and the other not] is to engage in individualized fact-finding." *Romerio v. Unumprovident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009). In *Romerio*, the court reversed the district court's order certifying a class that included "[a]ll plan beneficiaries" insured under an ERISA long-term disability plan issued by UnumProvident who had a claim denied, terminated, or suspended after being subjected to any one of a number of practices alleged in the complaint. The plaintiffs "challenge[d] a group of loosely-defined practices that were *not* applied uniformly to a discrete, easily-defined class of individuals." *Id.* at 430-31. "[A] class limited to those persons whose benefits were denied or terminated would necessarily include many individuals whose claims were *properly* denied for medical reasons." *Id.* at 431. The court acknowledged that the district court certified a class defined to include only those plaintiffs subjected to the practices alleged in the complaint.

> Such definition, however, does little to distinguish between the set of individuals whose claims were properly denied for valid medical reasons and the set of individuals whose claims were improperly denied for profit-driven reasons. Indeed, as Unum has correctly argued, the only way to distinguish between the two sets of individuals is to engage in individualized fact-finding, and the need for such individualized fact-finding makes the district court's class definition unsatisfactory.

*Id.*[5] (citing *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986); MOORE'S FEDERAL PRACTICE ¶ 23.21[3][c])).

---

[5] In a published case, the Sixth Circuit adopted a similar view of this sort of individualized inquiry in the superiority context. *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618 (6th Cir. 2011). Another ERISA-fiduciary class action, the court reversed the district court's certification order because "determining whether an administrator is a fiduciary with respect to a particular action requires a functional analysis to determine if the administrator exerted any authority or control over a fund's assets when it took the action in question." *Id.* at 631. Because the district court "would be required to conduct individualized inquiries into the [] terms and funding arrangements of each [] customer," which meant "looking at the contract terms and funding arrangements of 550 to 875 class members," the necessary "individualized inquiries" precluded a class action from serving as the superior form of adjudication. *Id.*

18

However, the circuit has also indicated this sort of individualized inquiry will not defeat certification. In *Young*, the court considered a class (composed of a number of subclasses) suing multiple insurance companies who allegedly charged an excessive collection fee on a Kentucky tax. The district court certified the subclasses and defined them as all persons who purchased insurance from, or were underwritten by, one of the defendants, and who were charged government taxes on their premiums which were not owed or were at higher-than-permitted rates. On appeal, the defendants challenged the ascertainability of the class. The court rejected the defendant's argument the class was impermissibly indefinite. Quoting Moore's Federal Practice, the court noted "[f]or a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538. Because plaintiff's classes were "defined by class categories of objective criteria," including location, geographical boundaries, the local tax for that district, and the local tax charged, they were adequately defined by objective criteria. *Id.* at 359. Although this determination overlapped to some degree with the elements of the plaintiffs' claims, "allowing a determination that an individual was subject to one tax, but was charged a different tax, is no different than determining whether an individual is of a minority race or gender, required elements in class action discrimination cases and most certainly part of the class definition." *Id.*

Particularly relevant here, the court also considered the administrative feasibility of the class due to the "large number of individual determinations [required] in order to ascertain class membership." *Id.* The defendants argued they would be required to review millions of policies in order to determine which policyholders were overcharged. The court, however, stated "[s]everal other courts have found that the size of a potential class and the need to review individual files to

19

identify its members are not reasons to deny class certification." *Id.*

> It is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies.

*Id.* at 540. The court held the district court properly rejected these arguments against the class definition. Moreover, the court rejected the defendants' argument individual inquiry would be required, because the plaintiffs' theory that a verification process would have caught the errors resulting in overcharges was a predominate issue central to each of the plaintiffs' claims. *Id.* at 544-45.

### (a) Ascertainable

Defendants argue the class is not ascertainable. According to Defendants, identifying "persons or entities . . . who purchased and/or paid for some or all of the purchase price for Skelaxin . . . for consumption . . . other than for resale . . . [by] pa[ying] or reimburs[ing] some or all of the purchase price" will require inquiry into millions of transactions to determine which entities paid or reimbursed the purchase price for Skelaxin. For instance, a PBM could pay for Skelaxin and then charge an insurer or health plan for the drug. Both the PBM and the purchasing insurer would be a part of the class, Defendants argue. Additionally, if an insurer paid for a drug and charged a plan on an ASO basis or as part of a premium, multiple individuals or entities could claim to have paid or reimbursed part of the purchase price.

End Payors, on the other hand, focus on the requirement for "objective criteria" and note the class definition is premised only on such criteria, i.e., whether the member purchased Skelaxin, whether it did so for its own consumption, whether it purchased for resale, and whether it purchased during the relevant period. Moreover, End Payors argue, Defendants' point boils down to a

20

complaint about the difficulty of identifying class members, which the Sixth Circuit has rejected as a basis to deny certification. *See Young*, 693 F.3d at 539 ("[T]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification.").

The proposed definition extends the class to any entity or individual who purchased Skelaxin "for consumption by themselves, their families, or their members, employees, insureds (including their insureds' members, participants, or beneficiaries), participants, or beneficiaries, other than for resale, during the period November 4, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease." The definition specifically defines an entity or individual who "'purchased' Skelaxin or its generic equivalent [to mean they] paid or reimbursed some or all of the purchase price."

End Payors appear correct that the class definition, at first glance, relies solely on objective criteria. The problem for End Payors, however, is their proposed class definition appears to conflict with their expert's view of the class, particularly with regard to what it means to "pa[y] or reimburse[] some or all of the purchase price" of Skelaxin. After reviewing Dr. Rausser's testimony and declaration, it becomes clear that what it means to "pay or reimburse" some or all of the purchase price is unclear and requires consideration of the individual contractual relationships underlying each transaction. Dr. Rausser described a method of deciding which entity or individual constitutes the end payor in these circumstances:

> [T]here are lots of parties that are involved in the transactions. They are agency relationships. They are PBMs that are out there that are engaged in the distribution and institutional framework. Many of them have no *price risk*. And thus, they are not end-payors, because they don't face any price risk.
> So the concept of price risk is critical with regard to separating who is – better yet, which transactions are in the determination of class-wide damages, for example, or which transactions have to be assessed with regard to common impact and which don't.

21

. . . .
       The – the simplest possible interpretation [of price risk] is all of those end-payors
       who have direct responsibility for covering the value of the transaction.
       The value of the transaction includes both the quantity and the price. Both of those
       are risk. Both the quantity and the price of the transaction is a risk that is borne by
       the end-payors.

(Court File No. 284-1, Rausser Dep., pp. 26-27) (emphasis added). Dr. Rausser stated repeatedly

this inquiry is *transaction* driven, and that making a determination about which entity bears the

"price risk" should be based on the circumstances of each transaction (*id.* at pp. 289-90) ("Focus on

the transaction. There is transactions [sic] that take place. . . . [I]f it turns out that ASP has price risk

. . . [although] ASOs, generally speaking don't have any price risk. . . . [w]ell, now they are the

third-party payor."); (*id.* at p. 291-92) ("There are instances . . . where there is some [price] sharing

arrangement . . . where [PBMs] have some of the price risk. . . . That's fine. Then they are a third

party – they are a third-party payor. But the fundamental point is, follow the transactions."); (*id.* at

p. 292) ("[T]he transactions are what are in my class."). Dr. Rausser also indicated there may be

situations where the "burden" of the overcharge is shared between a PBM and a health and welfare

plan "depend[ing] on the contractual relationship" (*id.* at p. 124); (*id.*) ("That's a factual question,

whether [the PBM and the welfare plan] share the burden or not. Is it possible? Yes. Do I have *all*

*the plans* to know whether, in fact, that's the case? No."); (Court File No. 364, Rausser Reb., ¶ 10)

("[I]f Party A pays the cost of a prescription drug and is reimbursed for its expense in full by Party

B, then A is not an End-Payor and is not included in the proposed Class. Instead, the claim belongs

to B. Furthermore, if A is reimbursed for 90% of the cost, then I understand that A is an End-Payor

only with respect to the remaining 10% of the cost that it has absorbed."). Dr. Rausser stated he did

not need to look at the individual contractual relationships to complete his common impact analysis

or to compute class-wide damages, but in order to determine price risk he conceded he would have

to consider the circumstances of the individual contractual relationship (*id.* at p. 330). After he admitted this counsel asked, "[T]o be clear, only those PBMs that had the price risk are members of the end-payor class, correct?" Dr. Rausser replied, "Yes."

In order to determine who is a member of the class, individual inquiry into contracts covering millions of purchases of Skelaxin would be required. Dr. Rausser, for his part, characterized this as a "claims administration" issue to be addressed following a determination of liability. End Payors argue the issues identified by Defendants are not as concerning as Defendants suggest. For instance, Defendants note the class definition is limited to those individuals or entities who purchased Skelaxin for consumption by themselves or their insureds, participants, or members. So if multiple entities are involved in any one transaction, only the entity who purchased Skelaxin for its own members would be the class member. This is the case in the ASO arrangements, because the PBM who purchases Skelaxin and is reimbursed by a plan has no relationship to the plan participant. In that case, the plan is the class member, not the PBM. On the other hand, where a plan pays a commercial insurer for coverage of all plan participants, the insurer is part of the class because it is purchasing the drug for its insureds. The plan, meanwhile, is specifically excluded because fully-insured plans are listed among the class exclusions. End Payors also offer the declaration of Matthew Potter, a consultant who handles settlement administration, who states his company has procedures to avoid duplicative damage awards in cases such as this.

As the Court sees it, the issue with End Payors' class is not whether a purchaser was damaged in each individual transaction; the issue is whether a purchaser *constitutes a class member*. As Dr. Rausser states, this would require analyzing each contract or agreement and deciding which entity or individual is the class member for that *transaction*. In rebuttal, Dr. Rausser opined as

23

follows.

> The economic burden of each overcharge for Skelaxin or metaxalone is borne either by the consumer alone or, in the case of insured consumers, by the consumer and its third-party payor ("TPP") that shares part of the cost. Ultimately, this means that questions will arise regarding the allocation of damages to individual members of the proposed Class. I understand that this is a process routinely (and successfully) handled during claims administration for similar cases. I am also informed by counsel that Plaintiffs have proposed a bifurcated trial, separating liability and damages. The damage methodology I have previously proposed accurately computes the economic injury to the entire proposed Class, and sufficient data clearly exists to apportion these damages to the three groups of claimants (uninsured consumers, insured consumers and TPPs). Further, the Class is clearly defined in a manner that precludes multiple participants to a single transaction from asserting a claim to the same potential damage dollars. Defendants' insistence that there may be conflicting claims depends on a failure to correctly interpret the Class definition, resulting in the inclusion of those who are not, in fact, End-Payors.

(Court File No. 364, Rausser Reb., pp. 2-3).

But until proceeding through each transaction and resolving factual disputes about who "bears the burden" of the price in that transaction, the Court cannot say who is a member of the class, that is, who has paid or reimbursed a portion of the purchase price. Although the class is circumscribed to only those entities who paid for their own consumption or the consumption of their constituents, End Payors' expert testified that, depending on the circumstances of each transaction, an end payor may be one or more entities or individuals sharing the burden. As Defendants' expert concedes, this could include PBMs who typically purchase from a retail pharmacy and are reimbursed by a commercial insurer or plan sponsor (Court File No. 282, Hughes Decl., ¶ 19). The price the PBM is reimbursed will be based on the individual contract, which may well be lower than the price paid to the retailer (*id.*). Although Dr. Rausser responds that most PBMs will be "fully reimburse[d]," (Court File No. 364, Rausser Reb., ¶ 11), the Court would have no way of resolving this question without resort to each contract. And because PBMs are involved in some seventy

percent of all prescription transactions (Court File No. 282, Hughes Decl., ¶ 29), those inquiries would be extensive.[6] Although some TPPs who shared the burden in a given transaction, such as PBMs, are not class members (because they did not purchase Skelaxin for their own use or the use of their constituents), the problem of identifying which entities are "end payors" by Dr. Rausser's logic–some of which *are* included in the class–still involves individualized fact-finding. These preliminary factual questions about class membership would have to be resolved on an individualized basis, involving exactly the sort of "mini-trials" that are incompatible with class actions. *See Marcus*, 687 F.3d at 593.

End Payors' reliance on an ostensibly simple "claims administration" procedure for making this determination post-liability does not rectify this problem. Matthew Potter, for instance, has extensive experience in administering *settlements* of indirect purchaser class actions. He states "[w]hile Rust's experience primarily comes from class action settlements, our methods for allocating and distributing funds obtained through a verdict would likely be the same or similar. In other words, it could be accomplished" (Court File No. 361-6, Potter Decl., ¶ 6). The proposed methodology is as follows.

- All claimants submit a claim for damages "*as a part of a settlement*" under penalty of perjury.
- Rust may audit any claim and red flag suspicious claims during which they may seek additional proof or evidence of damages.
- The entities would state whether they are filing on their own behalf or as an agent and state what type of entity they are. A PBM, for example, would submit claims on behalf of all its

---

[6] One might wonder why a PBM would accept a *lower* price than it paid the retailer. "PBMs' profits come from a variety of different arrangements with insurers and plan sponsors. A PBM may charge the insurer or plan sponsor an administrative fee for each reimbursed prescription. A PBM may also retain some or all of the rebates received from pharmaceutical companies. In addition, a PBM may charge a higher price for a drug to the insurer or plan sponsor than it pays to the pharmacy, an arrangement known as spread pricing" (Court File No. 282, Hughes Decl., ¶ 30).

25

eligible clients and receive a settlement check to distribute to its clients "in accordance with their specific contractual arrangement."

- Each form must contain the Federal Employer Identification Number for whichever entity is included in that claim.

(*id.* at ¶¶ 10-11). Although Potter explains these procedures in the context of avoiding "conflicts" or duplicative damages, it is as detailed as he gets with respect to what the actual methodology would entail. Potter also claims, in response to Defendants' expert's contention that no formula exists to capture contractual variations, data offered from entities "sufficiently capture[] variations in contracts, making the review of actual contracts unnecessary for damage allocation" (*id.* at ¶ 15).

This is insufficient. The proposed "claims administration" procedure is wholly post-hoc whittling of the class in the context of *settlement*. This methodology does nothing for the individual fact-finding required if this case were put to a jury. Based on End Payors' own expert, that determination would require inquiry into who bore the "economic burden" or "price risk" of each individual transaction (of millions of transactions). In each transaction that involved an overcharge, someone or some entity will be the class member for the purposes of that individual transaction, at least in part. Potter's settlement-focused methodology does not account for the type of individualized inquiry that would be required.

This case is not unlike *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). In *Carrera*, the Third Circuit reversed certification on the basis of ascertainability. The plaintiffs argued class membership could be demonstrated using a retailer's records of sales made with loyalty cards and records of online sales. The plaintiffs pointed to a FTC settlement with CVS that used similar methodology. However, the court stated this was insufficient because there was no evidence a single purchaser could be identified this way, no evidence the retailers actually had these records, and no evidence the settlement methodology had been successful. The court also noted "[s]ettlement

26

classes raise different certification issues than litigation classes." *Id.* at 308 n.4. The court rejected the plaintiffs' suggestion that affidavits of customers could be used to determine who made purchases falling in the class definition because "a defendant must be able to challenge class membership" and the possibility of fraudulent or inaccurate claims is unfair to both absent class members and the defendant. Moreover, particularly relevant here, a declaration from Rust Consulting, Inc., the same company Potter represents, was insufficient to demonstrate a proper methodology:

> [Rust's declaration did not] propose a model for screening claims that is specific to this case. And even if Rust produced a model that is specific to this case, we doubt whether it could satisfy the ascertainability requirement. At this stage in the litigation, the district court will not actually see the model in action. Rather, it will just be told how the model will operate with the plaintiff's assurances it will be effective. Such assurances that a party "intends or plans to meet the requirements" are insufficient to satisfy Rule 23.

*Id.* at 311 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008)).

Similar problems are at issue here. What little about the methodology has been disclosed to the Court appears appropriate for settlement, not for the type of fact-finding required in a merits analysis. And End Payors have not identified what in each transaction would be required to determine who bears the price risk–their expert has only identified this as a distinction between those who are "end payors" and those who are not.

The Court concludes the class in this case is not ascertainable. The question of who paid or reimbursed a portion of the purchase price for Skelaxin is–according to End Payors' own expert–a question with no simple resolution. The individualized fact-finding required to shape the proposed class is inconsistent with class treatment. Accordingly, the Court will **DENY** End Payors' motion for class certification.

However, this does not appear to be a fail-safe class, as argued by Defendants. *See Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (a class defined as those "entitled to relief" is an "improper fail-safe class" because "[e]ither the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment"). Dr. Rausser's and End Payors' theory is that, with reference to the circumstances of each transaction, whoever bears the "price risk" can be determined regardless of whether liability is eventually found to be lacking. Although a jury might find the end payor in all or some of the transactions did not pay an overcharge at all, which entity or individual constitutes an end payor would still be discernible based on Dr. Rausser's methodology. However, the Court must assume as much because how Dr. Rausser determines the placement of that risk or burden is unclear to the Court. In fact, were the Court to certify this class, Defendants could face subsequent suits from TPPs (such as, perhaps, PBMs) who argue they bore the price risk in any number of transactions but were not a part of the class because they did not purchase for their own consumption. Defendants would then be forced to pay duplicative damages in a separate proceeding, which is anathema to class certification.

### (b) *Comcast*

Even if Court were to accept End Payors argument and conclude the class definition excludes PBMs and is otherwise ascertainable, the Court has reservations about the incongruity between End Payors' understanding of the class and Dr. Rausser's impact and damages model.

In class certification, the damages model must be consistent with the theory of liability. In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), the Court concluded certification was inappropriate where the damages model and the theory of liability differ. The plaintiffs sought to demonstrate antitrust impact (individual injury resulting from an antitrust violation) through four

28

theories, but the district court only accepted one: that the defendant's conduct prevented competition from other companies that would build in areas where another company already operates. The classwide damages model, however, did not distinguish between this theory and the other three. On appeal, the court of appeals held that, at the class certification stage, the plaintiff need not tie each theory of antitrust impact to an exact calculation of damages, and the plaintiff need only assure that they can prove antitrust impact and that damages are capable of measurement.

The Supreme Court, however, concluded that "under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 133 S. Ct. at 1433. "[A] model purporting to serve as evidence of damages in this class action *must measure only those damages attributable to that theory*. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* (emphasis added). Although "[c]alculations need not be exact, [] at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Id.* The Court, in response to the court of appeal's discussion of the "assurances" of impact and measurable damages, noted that "such assurance is not provided by a methodology that identifies damages that are not the result of the wrong." *Id.* at 1434.

Dr. Rausser's testimony and reports indicate his model for class-wide damages includes transactions with entities that End Payors now argue should be excluded from the class because they

did not purchase Skelaxin for their own consumption (or their constituents' consumption). In rebuttal, Dr. Rausser states

> [t]he division of damages among Class members does not imply conflicting or duplicative claims. Most of the examples conjured by Defendants and deemed so complex as to require individualized contract analysis can in fact be resolved by applying the term "End-Payor" accurately. An indirect purchaser is an End-Payor only of the portion of the purchase price that it absorbs, *i.e.*, the portion for which it has paid without subsequent reimbursement. By virtue of the fact that every prescription is paid exactly in full, the sum of all End-Payors' shares of the purchase price equals the purchase price: no more and no less. Dr. Hughes himself acknowledges that "the consumer is, in fact, sharing the 'total' overcharge with the insurance plan." Regardless of the number of ways in which the cost of a prescription can be shared, the relevant parties are simply engaged in cost sharing. The overcharge paid for each purchase of Skelaxin and metaxalone is reflected in the purchase price and does not change merely by virtue of being shared among multiple parties.

(Court File No. 364, Rausser Reb., ¶ 21). But Dr. Rausser has conceded that one of these "multiple parties" may in fact be a PBM or other entity that End Payors have excluded from the class because it does not purchase the drug for its own consumption or the consumption of others.[7]

Indeed, Dr. Rausser indicates that for many transactions a TPP may only be a member of the class with respect to a portion of the transaction (Court File No. 364, Rausser Reb., ¶ 11) ("Furthermore, if A is reimbursed for 90% of the cost, then I understand that A is an End-Payor only

---

[7] In his rebuttal report, Dr. Rausser argues, although some circumstances might exist where a PBM would be an end payor, they are very few. In deposition, however, he testified what really matters is the circumstances of each transaction (Court File No. 284-1, Rausser Dep., pp. 289-90) ("Focus on the transaction. There is transactions [sic] that take place. . . . [I]f it turns out that ASP has price risk . . . [although] ASOs, generally speaking don't have any price risk. . . . [w]ell, now they are the third-party payor."); (*id.* at p. 291-92) ("There are instances . . . where there is some [price] sharing arrangement . . . where [PBMs] have some of the price risk. . . . That's fine. Then they are a third party – they are a third-party payor. But the fundamental point is, follow the transactions."). He did note that most PBMs are "just service providers" who "don't have any price risk" but "[t]hose who function both as an agent and provide some insurance, they are a third-party payor" (*id.* at p. 36).

with respect to the remaining 10% of the cost that it has absorbed.").  Where a TPP did not purchase for itself or its constituents and is not a class member with respect to the remaining portion, it would not be entitled to recovery in this action.  However, the portion of the antitrust impact it absorbed would be included in the damages model.

Other examples involve discount and rebate guarantees.[8]  In a discount guarantee, a PBM negotiates discounts with pharmacies for certain drugs and passes the discount onto the insurer or plan sponsor in part or in full or may negotiate a predetermined discount without regard to the actual discount received (Court File No. 282, Hughes Decl. ¶¶ 46, 47).  In one variant, the PBM agrees to pass on any discount in excess of an agreed minimum and where the discount falls below the minimum, the PBM absorbs the loss.  In that circumstance, the PBM could argue it absorbed a portion of the overcharge from the pharmacy.  A rebate guarantee involves apportioning manufacturer's rebates among the PBM and other TPP (*id.* at ¶ 48, 49).  These may involve fixed-dollar guarantees per prescription, in which case a PBM would absorb the overcharge if it received less in rebates than the agreed fixed amount.

Dr. Rausser responds that these guarantees apply "in the aggregate" rather than to a single drug and they do not affect the price paid for each individual prescription (Court File No. 364, Rausser Reb., ¶ 15).  Because they are "separate from the reimbursements paid for the cost of a specific prescription[,] [a]ny such compensation is irrelevant to an assessment of overcharges and their subsequent allocation" (*id.*).  But the TPP (and possibly the insured) have paid less than the full

---

[8] In his impact and damages models, Dr. Rausser removed rebates from the "but-for" world, assuming that King would have discontinued these rebates after generic entry (Court File No. 435, Rausser Decl., at ¶ 139).  But rebates are relevant to the amount actually paid by the class and non-class TPPs (*id.*) ("Branded drug manufacturers typically use rebates to third-party payors as a way of encouraging favorable formulary status and, thus, producing larger sales.").

31

overcharge in these circumstances because of the rebate or discount applied *pursuant to* the Skelaxin purchase. The portion the PBM absorbed in excess of the minimums would constitute a portion of the antitrust overcharge and the PBM may be entitled to damages. However, were End Payors' view of the definition of the class to win the day, the PBM would be excluded from this action (as it likely did not purchase for its own consumption or its constituents' consumption). But the portion it absorbed would be calculated as a part of total, class-wide damages (*id.* at ¶ 17) ("[T]hese techniques [by which PBMs negotiate or set the price paid *to the pharmacy*] are irrelevant to both the assessment of common impact and the accurate determination of class-wide damages. My analysis is based on the price *in fact* paid to the pharmacy after all such negotiations are done.") (emphasis in original).

The exact reach of *Comcast*, including the extent to which *Comcast* requires that a damages model calculate damages on a classwide basis, is a matter of some controversy. The issue of whether plaintiffs are required to demonstrate damages "on a classwide basis" through use of "common methodology" was uncontested on appeal, *Comcast*, 133 S. Ct. at 1430, and the dissent specifically cautioned that "the decision should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable 'on a class-wide basis,'" *id.* at 1436 (Ginsburg and Breyer, JJ., dissenting). The Sixth Circuit, in dicta, has indicated *Comcast* did not significantly change the law in this area, *In re Whirlpool Corp.*, 722 F.3d at 858-61 (concluding *Comcast* has little usefulness where a district court certifies a liability-only class but then discussing *Comcast*'s effect on damages-class cases), although at least one other circuit has suggested *Comcast*'s reach was much broader, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013).

But if *Comcast* is given its full breadth, the incongruity between End Payors' description of class membership and the entities included in its impact and damages model might defeat this proposed class. As discussed above, Dr. Rausser's damages and impact model includes damages suffered by TPPs who are *not* members of the class as understood by End Payors: it includes damages suffered by PBMs and other TPPs not purchasing for themselves or their constituents. The Supreme Court made clear, however, that "evidence of damages in [a] class action must measure only those damages attributable to th[e certified] theory." *Comcast*, 133 S. Ct. at 1433. Although the *theory* would be the same in this case regardless–that end purchasers were harmed by delayed-generic pricing–the damages model would not measure damages attributable *only* to End Payors' theory. The model would also incorporate damages suffered by TPPs who are ostensibly excluded from the class. *Id.* at 1434 (noting that no "assurance" of the capability of computing damages is "provided by a methodology that identifies damages that are not the result of the wrong"). Given *Comcast*'s requirement that the damages model and the theory of liability match, such a model could be problematic.

### ii. Typicality

End Payors' proposed class also appears to suffer typicality problems. Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a). "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *In re Am.*, 75 F.3d at 1082 (quoting 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 3-13, at 3–76 (3d ed. 1992)). "[W]hen such a relationship is shown, a plaintiff's injury arises from or is directly related

33

to a wrong to a class, and that wrong includes the wrong to the plaintiff." *Id.* (quoting 1 NEWBERG, 3d ed., § 3.13, at 3-76)  A plaintiff's claim is "typical" if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Id.* (quoting 1 NEWBERG, 3d ed., § 3.13, at 3-76); *Gen. Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980) ("[T]ypicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims"); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir. 1976) ("To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law").  Where a named plaintiff's proof of his own claim would not necessarily prove anyone else's claim, the typicality requirement is not satisfied. *Sprague*, 133 F.3d at 399.  "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re Am.*, 75 F.3d at 1082.

"[C]laims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) (quoting *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998)). However, for the reasons discussed in the context of ascertainability, typicality may be lacking in this case. The *Romerio* court found typicality lacking due to the individualized fact-finding that case presented. "Where a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members, the typicality premise is lacking for-under those circumstances-it cannot be said that a class member who proves his own claim would necessarily

prove the claims of other class members." 385 F. App'x at 431 (citation omitted). This is the case here.

As noted, End Payors' expert has identified the issue of economic burden or price risk to distinguishing among the many "purchasers" of any given Skelaxin prescription. Thus there may be circumstances in which an entity or individual who purchased Skelaxin for its own consumption or the consumption of its constituents did *not* bear the "price risk" and by Dr. Rausser's logic does *not* actually constitute an end payor.[9] However, the class definition includes those entities or individuals on its face. Thus the plaintiff who proves its claim–by showing anticompetitive conduct and demonstrating it overpaid in any number of transactions in which it bore "price risk"–does not prove the claim of other class members who did not bear such a risk. And the commonality of the anticompetitive conduct question does not shield End Payors from the typicality requirement. *See id.* at 432 ("That all of the plaintiffs may have been subjected to some or all of Unum's alleged wrongful practices does not eliminate the need for an individualized assessment as to the ultimate propriety of the benefits decisions affecting each and every class member."). "Because individualized assessments are necessary, it cannot be said that if a named plaintiff succeeds in establishing [Defendants'] liability for breach of fiduciary duty, 'so go the claims of the class.'" *Id.* (quoting *Sprague*, 133 F.3d at 399).

### iii. Adequacy of Representation

Similar concerns suggest the proposed class representative may be inadequate. Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests

_____

[9] Dr. Rausser would likely contest this point and state that these end payors will frequently (if not always) bear the "price risk." But his methodology for making this determination is more or less undisclosed to the Court.

of the class." Fed. R. Civ. P. 23(a). "No class should be certified where the interests of the members are antagonistic, because the preclusive effect of the verdict may deprive unnamed class members of their right to be heard." *Smith v. Babcock*, 19 F.3d 257, 264 n.13 (6th Cir. 1994) (citing *Hansberry v. Lee*, 311 U.S. 32, 45 (1940)). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Young*, 693 F.3d at 543 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)). The Sixth Circuit has articulated two criteria for determining adequacy of representation: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young*, 693 F.3d at 543 (quoting *In re Am.*, 75 F.3d at 1083).

Again, Defendants argue an impermissible conflict of interest exists here based on the multiple purchasers who could claim damages from any single purchase of Skelaxin. Some of them, such as PBMs, would be advantaged by arguing the first purchaser bears the price risk because PBMs are often the first purchaser. On the other hand, commercial insurers and self-funded plans have an incentive to say they are the actual end payors and should receive the entire overcharge.

End Payors argue that this is really an issue of allocating damages and such a conflict does not defeat certification. *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 337 (E.D. Mich. 2001) ("[H]ypothetical conflicts regarding proof of damages are not sufficient to defeat class certification . . . ."). End Payors also argue the conflict is "nonexistent" because "[f]or the vast majority of transactions" only one TPP will have purchased for consumption by its constituents, and if some transactions involve more than one such TPP, "it will merely require a damages allocation."

36

End Payors have offered a trial management plan that bifurcates (or, more accurately, *tri*furcates) the trial into three stages: (1) liability; (2) class-wide damages; and (3) finally, the Court appoints a special master to determine individual damages based on "proofs of claim and data, under oath, by class members." The special master would evaluate "each damage claim pursuant to a formula proposed by Plaintiffs' experts and approved by the Court" and Defendants would be entitled to contest the calculations.

Setting aside whether this procedure would be manageable (which is doubtful given the millions of transactions at issue), End Payors are attempting to have it both ways. They argue the class is ascertainable because members are identified by objective criteria. They downplay the extent to which the "price risk" issue is relevant to class membership even though their own expert states that, beyond the definition of the class, another inquiry would be required to actually identify who constitutes an "end payor." But if the price risk inquiry does not limit which entities and individuals constitute class members, then clearly it creates a class conflict. Assuming the Court bought End Payors' ascertainability argument, the class would then include all entities and individuals who "purchased" Skelaxin for their own use or the use of their constituents. But as End Payors' expert concedes, in some circumstances these entities will not bear the "price risk" and so are not end payors for the purposes of his class-wide damages calculation. Thus each "purchaser"–who is a class member, were End Payors' argument on ascertainability to win the day– has an incentive to define "price risk" differently for each transaction so as to maximize its own reimbursement. Not only do the different categories of potential class members have divergent interests in this regard as a general matter, but each *transaction* has potential class members who would have divergent interests regarding who, in that transaction, paid the overcharge. Thus End

37

Payors' proposed trial management plan does not account for the possibility the Court will be pulled into deciding who bears this burden or risk on literally *millions* of transactions.

In other words, either the class is not ascertainable because the Court must resort to some unknown methodology to determine who bears a "price risk" in each transaction, or the class is ascertainable because it includes even those purchasers who do not bear the price risk. But if the latter is true, in addition to the *Comcast* issue discussed above, the class then contains an impermissible conflict because each class member would have an incentive to define price risk differently so as to maximize its own recovery.

### iv. Conclusion

For the foregoing reasons, the Court will **DENY** End Payors' motion for class certification with respect to the proposed damages class.

### 3. Injunction Class

Although the parties barely discuss the proposed injunction class, the Court concludes its analysis must extend to that class as well. Rule 23(b)(2) provides for class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." But as the Supreme Court has explained, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557. Indeed, Rule 23(b)(2) is "designed to permit only classes with homogenous interests." *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 447 (6th Cir. 2002).

38

As an initial matter, some courts decline to certify injunction classes where the primary relief sought is money and there is no need for a large, injunction-only class. *See In re Graphics Processing Units Antitrsut Litig.*, 253 F.R.D. 478, 507-08 (N.D. Cal. 2008) (collecting cases and noting "[f]rom the onset of litigation, it has been crystal clear that both groups of plaintiffs have primarily sought monetary damages. . . . [P]laintiffs have given no justification for why such massive classes are needed when a more limited class [of direct purchasers] will adequately cure any alleged ongoing harm."). Although an injunction-only class is an expedient means of ensuring a path forward even if the Court were to (as it has) deny certification to the damages class, it is unclear whether an injunction class of End Payors is necessary or appropriate in this case.

Regardless, the question of class membership still counsels against certification in this case because the Court is unable to determine without individualized inquiry which entities are members of the class based on Dr. Rausser's discussion of "price risk." Even if the Court were to accept End Payors' ascertainability argument in light of the class definition's "objective criteria," these concerns do not dissipate. Which entities constitute class members for which transactions is still an open question, and the methodology to make this determination has still not been disclosed to the Court.

And that difficulty raises perhaps a more troubling issue: the preclusive effect of an injunction-only class action on class members' ability to bring subsequent damages claims. Many courts have acknowledged the claim preclusive difficulties associated with injunction-only class actions. Sometimes called "claim-splitting," the basic principle is that "a final judgment on the merits generally precludes a plaintiff from bringing a new lawsuit raising issues that could have been litigated in the first suit, but were not." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114 (E.D.N.Y. 2012). Thus where a proposed class seeks only to enjoin some misconduct that also

causes actionable personal or property injury, some courts express hesitation at the ability of absent class members–who, in Rule 23(b)(2) classes, have no opt-out capabilities–to subsequently obtain monetary relief. *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 209 F.R.D. 323, 339 (S.D.N.Y. 2002).

There is considerable disagreement among courts on this issue. Some courts, including the Sixth Circuit, have held that claim-splitting does not apply to class actions and that "the general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if based on the same events." *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996); *see also Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 428 n.16 (6th Cir. 2012); *Hiser*, 94 F.3d at 1291 ("[E]very federal court of appeals that has considered the question has held that a class action seeking only declaratory or injunctive relief does not bar subsequent individual suits for damages.") (quoting *In re Jackson Lockdown/MCO Cases*, 568 F. Supp. 869, 892 (E.D. Mich. 1983)). But many courts have also recognized the uncertainty in the application of many of these cases. *See, e.g.*, *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 563-64 (C.D. Cal. 2012) (noting that *Hiser* involved a plaintiff who was not a member of the class that obtained injunctive relief in the earlier action); *Zachery v. Texaco Exploration & Production, Inc.*, 185 F.R.D. 230, 243-45 (W.D. Tex. 1999) (noting the uncertainty wrought by *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867 (1984) in this area). Moreover, even if such a judgment did not have a claim preclusive effect, it might still prevent relitigation of a number of issues in subsequent actions. *See MTBE*, 209 F.R.D. at 339-40 n.25; *see also Dukes*, 131 S. Ct. at 2559 (discussed more fully below).

At least one court, dissatisfied with simply rejecting such classes, explicitly reserved absent

40

class members' rights to seek monetary relief consistent with the Restatement (Second) of Judgments. *In re Vitamin C*, 279 F.R.D. at 115-16 (quoting Restatement (Second) of Judgments § 26(1)(b) (1982) ("The court in the first action has expressly reserved the plaintiff's right to maintain the second action.")). But even that court acknowledged it cannot guarantee a subsequent court will recognize this reservation, given that no court can determine the preclusive effect of its judgment in a separate, subsequent action. *Id.* ("This, of course, is not a guarantee of what subsequent courts will actually do, but it is sufficient to extinguish defendants' claim-splitting concerns for the purpose of class certification."). This uncertainty is the impetus for the denial of certification in other courts. *See, e.g.*, *Zachery*, 185 F.R.D. at 244 ("Because there appears to be no clear cut right to opt out of a Rule 23(b)(2) class action, the named Plaintiffs are asking the class members being represented here to risk waiving their right to monetary damages solely so the action for disparate treatment can proceed as a class action. Although the opt-out issue has not been fully decided, the Court is unwilling to risk this result.").

Adding more fuel to the fire, the *Dukes* court recently acknowledged this issue. The Court was called to consider the availability of monetary damages in a Rule 23(b)(2) class. The Court confronted the respondents' argument that Rule 23(b)(2) could provide for money damages if they do not predominate over injunctive or declaratory relief. Rejecting this argument, the Court referenced "perverse incentives" created by allowing such claims. *Dukes*, 131 S. Ct. at 2559. For instance, in *Dukes*, the class only sought backpay in order to strategically avoid seeking monetary relief that "predominate[d]" over the injunctive relief. *Id.* Relevant here, the Court noted the omission of other damages "created the possibility . . . that individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold

themselves apart from." 131 S. Ct. at 2559. "If it were determined, for example, that a particular class member is not entitled to backpay because her denial of increased pay or a promotion was *not* the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial." *Id.* Although the Court considered this issue in the context of a Rule 23(b)(2) class that was also seeking monetary relief, rather than just injunctive and declaratory relief as End Payors do here, its concern regarding the preclusive effect of a primarily injunction-based class raises serious questions about the propriety of certifying such a class in this case. This is particularly true given the backdrop of disagreement discussed above.

The Sixth Circuit also acknowledged this issue recently. In *Gooch*, the defendant objected to the "piecemeal certification" of an injunction and declaratory judgment class. The court found "nothing objectionable" about certifying one count of the complaint, and concluded "certifying declaratory relief under Rule 23(b)(2) is permissible even when the declaratory relief serves as a predicate for later monetary relief, which would be certified under Rule 23(b)(3)." *Gooch*, 672 F.3d at 428-29. However, the court confronted the *Dukes* issue as well. It acknowledged the general rule that claim-splitting does not apply to class actions and that "individual actions remain available to pursue any other questions that were expressly excluded from the class action." *Id.* at 428 n.16. However, when confronting the discussion of the issue in *Dukes*, the court noted that the preclusion feared by the *Dukes* court was not possible in *Gooch* because "any monetary relief would be certified under Rule 23(b)(3)," which was alleged in the plaintiff's complaint and had not yet been ruled upon by the district court. *Id.*

In this case, on the other hand, the Court declines End Payors' request to certify a damages class. This distinction from *Gooch* puts the *Dukes* issue into play. Not only does the Court have

42

reservations about the ascertainability of the class, the Court has reservations about the possible preclusive effect of such a class on the damages claims of absent class members. Even if claim-splitting is not implicated by class actions, absent class members may be collaterally estopped from relitigating some issues in a damages action, as the *Dukes* court feared. Accordingly, End Payors' motion will be denied in whole.

## B. Indirect Purchasers

### 1. Class Definition

Indirect Purchasers seek certification of the following class:

> All persons or entities in the United States and its territories that operate a business outside Tennessee and indirectly purchased Skelaxin for resale at any time during the period November 4, 2005 through and until the anticompetitive effects of Defendants' conduct ceased or ceases (the "Class Period").

In the alternative, Indirect Purchasers seek certification of four single-state subclasses consisting of indirect purchasers for resale in four states (California, Michigan, Mississippi, and New York):

| | |
|---|---|
| California Subclass: | All persons and entities that operate a business in California and indirectly purchased Skelaxin for resale at any time during the period November 4, 2005 through and until the anticompetitive effects of Defendants' conduct ceased or ceases (the "Class Period"). |
| Michigan Subclass: | All persons and entities that operate a business in Michigan and indirectly purchased Skelaxin for resale at any time during the period November 4, 2005 through and until the anticompetitive effects of Defendants' conduct ceased or ceases (the "Class Period"). |
| Mississippi Subclass: | All persons and entities that operate a business in Mississippi and indirectly purchased Skelaxin for resale at any time during the period November 4, 2005 through and until the anticompetitive effects of Defendants' conduct ceased or ceases (the "Class Period"). |
| New York Subclass: | All persons and entities that operate a business in New York and indirectly purchased Skelaxin for resale at any time |

43

during the period November 4, 2005 through and until the anticompetitive effects of Defendants' conduct ceased or ceases (the "Class Period").

If the court accepts the initial class definition, Indirect Purchasers seek to certify the class with respect to two laws: (1) violation of the Tennessee Trade Practices Act (Tenn. Code §§ 47-25-101, et seq.) ("TTPA"); and (2) unjust enrichment under Tennessee law. If the Court instead decides to only certify the subclasses, Indirect Purchasers seek to certify antitrust and unjust enrichment violations of each state's respective laws:

> California:
>> 1. California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, et seq.)
>> 2. California Unfair Competition Law (Cal Bus. & Prof. Code §§ 17200, et seq.) ("UCL")
>> 3. California Common-Law Unjust Enrichment
> Michigan:
>> 1. Michigan Antitrust Reform Act (Mich. Comp. Laws §§ 445.771, et seq.)
>> 2. Michigan Common-Law Unjust Enrichment
> Mississippi:
>> 1. Mississippi Antitrust Act (Miss. Stat. §§ 75-21-1, et seq.)
>> 2. Mississippi Common-Law Unjust Enrichment
> New York:
>> 1. New York Donnelly Act (N.Y. Gen. Bus. Law §§ 340, et seq.)
>> 2. New York Consumer Protection Act (N.Y. Gen. Bus. Law §§ 349, et seq.)
>> 3. New York Common-Law Unjust Enrichment

## 2. Expert Reports

### i. Dr. Lamb

Indirect Purchasers offer the declaration of Dr. Russell Lamb, Senior Vice President of Nathan Associates, Inc., an economic and financial consulting firm (Court File No. 161). Dr. Lamb concluded, assuming Indirect Purchaser's allegations are true, the delay in a generic entry to the market resulted in Indirect Purchaser class members paying higher prices for metaxalone than they would have otherwise paid. Relying on economics literature, evidence produced by Defendants, and

44

data showing sales and prices following actual generic entry, Dr. Lamb computed aggregate damages suffered by the class without requiring resort to individualized inquiry. Based on two entry scenarios, Dr. Lamb calculated classwide damages. In his rebuttal declaration, he estimated that removing the opt-out indirect purchasers reduces this damages and computed such an amount.

### ii. Dr. Hughes

Defendants' expert, Dr. James Hughes, explains that the financial returns from selling branded Skelaxin may have been higher than but-for profits for generic metaxalone. Dr. Hughes concludes "that the proposed class made more profits overall selling branded Skelaxin than it would have had generic metaxalone been available earlier, this is true on average for the class and must be true for a substantial portion of the class" (Court File No. 253, ¶ 9). This question, according to Defendants and Dr. Hughes, will require individualized determinations and is inappropriate for class certification.

### 3. Nationwide Class

### i. Necessity of a Choice-of-Law Analysis

Defendants argue choice-of-law principles preclude certification in this case. A choice-of-law inquiry is required before certifying a class.[10] *See Pilgrim v. Universal Health Card, LLC*, 660

---

[10] End Payors placed greater reliance than Indirect Purchasers on the argument such an inquiry was not required. End Payors relied upon *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 308 (3d Cir. 2011) (en banc), in which the Third Circuit noted "choice-of-law analysis would be particularly difficult in a nationwide class action where an array of factors beyond the residence of the class members must be considered, including, inter alia, the location of the parties and the purchased items, and the place of contracting and performance." Because this would "unduly complicate the process for establishing predominance under Rule 23. . . . many courts find it inappropriate to decide choice of law issues incident to a motion for class certification." *Id.* (quotation marks omitted).

However, *Sullivan* involved the proper standard for approving class *settlement*, and "in the settlement context, variations in state antitrust, consumer protection and unjust enrichment laws d[o]

45

F.3d 943, 946-48 (6th Cir. 2011) (concluding denial of class certification was proper because "different laws would govern the class members' claims"; "the consumer-protection laws of the affected States vary in material ways, no common legal issues favor a class-action approach to resolving this dispute"; and "any potential common issues of fact cannot overcome this problem. . . . [because there is] not a predominant factual overlap among the claims and surely not one sufficient to overcome the key defect that the claims must be resolved under different legal standards"). *See also In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) ("The district court's class certification was in error because the district court did not conduct a thorough conflicts-of-law analysis with respect to each plaintiff class member before applying Minnesota law."); *Spence v. Glock, Ges.m.b.H*, 227 F.3d 308, 313 (5th Cir. 2000) ("The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate.").

But Indirect Purchasers argue the Court has actually already decided this issue. In their motion to dismiss, Defendants argued the Indirect Purchaser's TTPA claims should be dismissed because the Indirect Purchasers are all nonresidents of Tennessee. The Court relied upon *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512 (Tenn. 2005), to reject this argument. In

---

not present 'the types of insuperable obstacles' that could render class litigation unmanageable." *Id.* at 303. In fact, the court noted that unlike "situations 'where the certification inquiry [is] set against the backdrop of an impending trial,' the settlement context here does not present equivalent concerns." *Id.* at 304 n.28 (citation omitted). It is precisely these concerns Defendants have raised here.

*Sullivan* acknowledges that some courts ignore choice-of-law analysis for the purposes of class certification. *E.g.*, *Singer v. AT&T Corp.*, 185 F.R.D. 681, 691-92 (S.D. Fla. 1998) ("It is well-established that consideration of choice of law issues at the class certification stage is generally premature."). But many courts, including the Sixth Circuit, have indicated otherwise. *Pilgrim v*, 660 F.3d at 946-48. Accordingly, the Court must consider the choice-of-law issue at this stage.

*Freeman*, the Tennessee Supreme Court discussed the TTPA and its applicability to indirect purchasers. The Court explained the statute did not "prohibit recovery to indirect purchasers who are non-residents of Tennessee." After emphasizing that the focus in applying the TTPA should be on the *effect* of the defendant's anticompetitive conduct on Tennessee trade or commerce rather than the conduct itself, the Court explained that the proper standard to apply when considering the TTPA is the "substantial effects" standard. *Id.* at 523. Under this standard, a court "must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree." *Id.* The test should be applied in light of the facts of the case. *Id.* Moreover, the anticompetitive conduct at issue "need not threaten the demise of Tennessee businesses or affect market prices to substantially affect intrastate commerce." *Id.* at 523-24.

Thus Indirect Purchasers argue, where they rely on a state statute with an out-of-state reach, no real choice-of-law issue is presented. *See Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009) ("Here, the choice-of-law analysis is straightforward. Storie brought the present action in the Southern District of Indiana, alleging a violation of an Indiana statute. It is well established 'that Indiana law applies to a claim under an Indiana statute.'") (quoting *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1166 (Ind. 2002)). For instance, the commentary to § 6 of the Restatement states

> The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid. On the other hand, if the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application. . . .  Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.

47

Restatement (Second) Conflict of Laws § 6 cmt. b.  Indirect Purchasers argue, given the Tennessee

Supreme Court's view of the TTPA articulated in *Freeman*, if Defendants' conduct had a substantial

effect on Tennessee then the normal choice-of-law analysis is beside the point: Indirect Purchasers

may proceed under the TTPA regardless of the other considerations.

But Indirect Purchasers miss the point: the basic purpose of the choice-of-law doctrine is that

more than one state's laws may be implicated in a given case.  *See Allstate Ins. Co. v. Hague*, 449

U.S. 302, 307-08 (1981) ("Implicit in this inquiry is the recognition, long accepted by this Court,

that a set of facts giving rise to a lawsuit, or a particular issue within a lawsuit, may justify, in

constitutional terms, application of the law of more than one jurisdiction. As a result, the forum State

may have to select one law from among the laws of several jurisdictions having some contact with

the controversy.") (internal citations omitted); *Jean v. Dugan*, 20 F.3d 255, 260-61 (7th Cir. 1994)

("If the laws of more than one jurisdiction arguably are in issue, *Erie* also requires a federal court

to apply that state's choice of law rules."). That *Freeman* recognizes the applicability of the TTPA

outside of Tennessee does not end the Court's analysis.  Regardless of whether the TTPA provides

a viable claim against Defendants, the Court must still undergo the appropriate choice-of-law

analysis.

Moreover, a recent Sixth Circuit case discussed choice-of-law in the context of consumer-

protection laws.  *Pilgrim* dealt with a healthcare discount program complete with advertisements in

newspapers.   The plaintiffs sued under Ohio state consumer-protection statutes and unjust

enrichment law in federal court seeking to represent a nationwide class.  The district court granted

one of  the defendants' motion to dismiss and struck the class action allegations against the other

defendant on the grounds that, under Ohio's choice-of-law rules, each class member's claim would

have to be analyzed under the law of his or her home state.  Given this difficulty, the court

concluded class action would be unmanageable.

The Sixth Circuit affirmed.  The court agreed that, under Ohio's choice-of-law rules that are

also based on § 6 of the Restatement, "the consumer-protection laws of the potential class members'

home States will govern their claims." *Id.* at 946.  Although the "location-based factors" pointed in

opposite directions, the state with the strongest interest was the state where the consumers are

harmed by it.  Otherwise, the "basic policies underlying" consumer protection laws would be

frustrated. *Id.*

> It would permit companies to "evade [local] consumer protection laws by locating
> themselves just across the [border] from the ... citizens they seek as customers."
> *Williams v. First Gov't Mortg. & Investors Corp.*, 176 F.3d 497, 499 (D.C. Cir.1999)
> (internal quotation marks omitted). And it would permit nationwide companies to
> choose the consumer-protection law they like best by locating in a State that
> demands the least. Does anyone think that, if State A opted to attract telemarketing
> companies to its borders by diluting or for that matter eliminating any regulation of
> them, the policy makers of State B would be comfortable with the application of the
> "consumer-protection" laws of State A to their residents—the denizens of State B?
> Highly doubtful: the idea that "one state's law would apply to claims by consumers
> throughout the country—not just those in Indiana, but also those in California, New
> Jersey, and Mississippi—is a novelty." *In re Bridgestone/Firestone, Inc.*, 288 F.3d
> 1012, 1016 (7th Cir.2002); *see also id.* at 1018 ("We do not for a second suppose that
> Indiana would apply Michigan law to an auto sale if Michigan permitted auto
> companies to conceal defects from customers; nor do we think it likely that Indiana
> would apply Korean law (no matter what Korean law on the subject may provide)
> to claims of deceit in the sale of Hyundai automobiles, in Indiana, to residents of
> Indiana . . . .").

*Id.* at 947.  The court noted it is "unclear" whether Ohio's consumer protection law even applies to

extraterritorial injuries and rejected two common pleas court cases that suggested it does.  Given the

fact that "consumer protection laws of the affected States vary in material ways," class certification

was inappropriate.  *Id.*

The Sixth Circuit in *Pilgrim* relied in part on *In re Bridgestone/Firestone, Inc.*, 288 F.3d

49

1012 (7th Cir. 2002). A class action arose over Ford Explorer SUVs and their problems with Firestone tires. The district court certified two nationwide classes, applied Indiana's *lex loci delicti* choice-of-law rules, and concluded that Michigan law applied to the class of purchasers of Ford Explorers and Tennessee law applies to the class of purchasers of Firestone tires. The plaintiffs on appeal argued that the place of the defendant's headquarters should determine the controlling law. The Seventh Circuit did not buy this argument, noting there was a "conspicuous lack of support from state decisions" and concluding "[i]f recovery for breach of warranty or consumer fraud is possible, the injury is decidedly where the consumer is located, rather than where the seller maintains its headquarters." *Id.* at 1017. State consumer protection laws "vary considerably" and accordingly class certification was inappropriate.

In fact, some courts have held failure to conduct a rigorous "choice-of-law" analysis in this context is reversible and violates Due Process and the Full Faith and Credit Clause. Defendants cite *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005). *St. Jude* involved a heart valve that had some statistically significant level of health effects requiring recall of unimplanted valves. Plaintiffs sued and sought certification of a nationwide class under a number of state-law theories, including consumer protection statutes, all of which were governed by Minnesota law. Without conducting a choice-of-law analysis, the district court certified the classes. On appeal, the Eighth Circuit reversed. Considering the consumer protection class, the circuit rejected the district court's conclusion a choice-of-law analysis was unnecessary because Minnesota's consumer protection law extended to "any person" including those outside Minnesota. Relying on the conclusion state consumer protection laws "vary considerably" from *In re Bridgestone*, the court cited to relevant Supreme Court precedent: "[F]or a State's substantive law to be selected in a constitutionally

50

permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981). The court concluded it could not make this determination because the district court did not analyze the "contacts between Minnesota and each plaintiff class member's claims." *St. Jude*, 425 F.3d at 1120.

> Application of Minnesota law to all plaintiffs' claims ultimately may be proper, although we suspect Minnesota lacks sufficient contacts with all the parties' claims, and the different states have material variances between their consumer protection laws and Minnesota's. There is no indication out-of-state parties "had any idea that [Minnesota] law could control" potential claims when they received their Silizone-coated valves. *Phillips Petroleum*, 472 U.S. at 822, 105 S.Ct. 2965. Regardless, protection of out-of-state parties' constitutional rights requires an inquiry into their claims' contacts with Minnesota and their individual state laws before concluding Minnesota law may apply.

*Id.* The court also rejected the argument that the Minnesota consumer statute could apply so broadly. The district court had reasoned that the statute could apply to out-of-state plaintiffs who were damaged by a deceptive trade practice and their individual states were immaterial. The Eighth Circuit thus reversed and remanded for a choice-of-law analysis in keeping with the Due Process and Full Faith and Credit Clauses.

Indirect Purchasers attempt to avoid at least some of these cases. First, Indirect Purchasers note the distinction between the TTPA and consumer protection laws. While these cited cases deal with laws that are intended to protect consumers, "the purpose of the TTPA is to protect the state's trade or commerce affected by the anticompetitive conduct." *Freeman*, 172 S.W.3d at 522. The difference here is important: the focus in the above cases is on the impact these consumer protection statutes have on the consumer whereas the focus here should be on the state. However, this is a consideration that should be taken into account *during* the choice-of-laws analysis. These cases still

demonstrate that the court should undergo such an analysis.

Indirect Purchasers also argue that *Pilgrim* is distinguishable. There, the court was applying *Ohio* law, not Tennessee's. And the court noted in *Pilgrim* that it was unclear whether Ohio's consumer protection statute even applied extra-territorially whereas in this case Tennessee answered that question affirmatively in *Freeman*. However, this distinction is of minimal consequence since Ohio also applies the Restatement view of choice-of-law. Moreover, the court noted the uncertainty of the reach of Ohio's state consumer statute only *after* concluding that it was inappropriate to apply one state's consumer protection laws to all plaintiffs in a nationwide class. The court affirmatively did *not* decide that Ohio's statute does not apply extra-territorially, but merely mentioned it as additional support for its conclusion the law of the state of injury should apply for the purposes of each plaintiff's claim.

Indirect Purchasers also point to a recent Ninth Circuit decision, *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106 (9th Cir. 2013). The plaintiffs, a number of wireless providers *not* suing as a class, sued the defendants on the ground that many of the displays they used in their phones were supracompetitively priced. They brought suit under California and federal law seeking recompense for both direct and indirect purchases. The defendants on appeal argued application of California's antitrust law to purchases outside of California violated their due process rights, relying on the Supreme Court's reasoning in *Allstate*. However, concluding that *Allstate* places only "modest restrictions" on application of forum law, the court concluded the Defendants' activity in California created a significant contact that was more powerful than the single contact of the plaintiffs' states (where they were injured).

Put differently, the district court's place-of-purchase rule represents a return to the "wooden" and "now largely abandoned" *lex loci delicti* doctrine—an approach the

52

plurality explicitly rejected in Allstate. *See Allstate*, 449 U.S. at 316 n. 22, 101 S.Ct. 633. The raison d'etre of choice of law analysis, particularly in the context of tort-like suits, is the common understanding that "a set of facts giving rise to a lawsuit, or a particular issue within a lawsuit, may justify, in constitutional terms, application of the law of more than one jurisdiction." *Allstate*, 449 U.S. at 307, 101 S.Ct. 633; see also Shutts, 472 U.S. at 823, 105 S.Ct. 2965 ("[I]n many situations a state court may be free to apply one of several choices of law."). We see no reason why the due process constraints on the application of state antitrust law should, unlike any other area of law, follow the obsolete *lex loci delicti* rule.

*AT&T Mobility*, 707 F.3d at 1111-12. Because the "occurrence or transaction" was the Defendants' alleged agreements and conspiracies, the district court should have considered all of the defendant's conduct within California in considering whether the application of California law would offend due process. Just as Indirect Purchasers argue here, the court noted that antitrust laws protect competition not consumers and California has a strong interest in ensuring protection of its business climate. The court thus concluded that application of California law was not a violation of due process, although it specifically noted it was not undergoing a choice-of-laws analysis because those arguments were not raised before the district court. *Id.* at 1113 ("Objections based on the interests of other states are more properly raised under a choice of law analysis, or potentially under a challenge predicated on some other provision of the U.S. Constitution. Defendants raised no such arguments before the district court.").

As indicated by the discussion above, the parties present starkly opposed views to the Court. Defendants note they are entitled to a determination of the appropriate choice-of-law under the Constitution. Indirect Purchasers reject these arguments as a "red herring," arguing *Freeman* establishes the broad reach of the TTPA and thus there is really no need for a choice-of-law analysis.

Defendants have the better position here. Although *Freeman* does establish the broad reach of the TTPA, that merely indicates a choice of law analysis is required because multiple state laws

53

are at issue, not that a choice-of-law analysis is unnecessary. The same can be said for Indirect Purchaser's argument that the purposes of the laws in *Pilgrim* and the antitrust laws here are different. That argument goes to which state's law should apply, not to whether the Court should consider choice-of-laws at all. The Court must balance the appropriate considerations as the Court is instructed to do by precedent that suggests choice-of-laws analysis is required before classes may be certified. And *AT&T* does not counsel otherwise: the Ninth Circuit considered the contours of the Due Process Clause, not choice-of-law considerations. Accordingly, the choice-of-law issue is discussed below.

### ii. Choice of Law

Indirect Purchasers argue, even if the Court were to undergo a choice-of-laws analysis, Tennessee law should still apply broadly to the entire class.[11]

The parties agree Tennessee choice-of-law rules apply to this case. Tennessee applies the "most significant relationship" test to choice-of-law issues, taken from Restatement (Second) of Conflict of Laws (1971) ("Restatement"), under which the law of the state with the "most significant relationship to the litigation" will be applied. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992); *see also Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Generally, the court should apply the full bevy of Restatement considerations:

---

[11] In Tennessee, typically courts determine whether a conflict exists between the states' laws before undergoing a choice-of-laws analysis, although some courts do not and others have noted "[t]he order in which the interrelated analyses take place is not as important as the fact that they be conducted." *Gov't Employees Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *29 (Tenn. Ct. App. June 29, 2007) (comparing cases). The Court discusses *choice*-of-law first because it is the primary dispute between the parties. Conflict-of-law is discussed below, and, as stated *infra*, was given little attention by Indirect Purchasers. The Court does conclude, however, that a conflict exists between the laws of the forty-nine states and additional territories.

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties,
(d) the place where the relationship, if any, between the parties is centered.

*Hataway*, 830 S.W.3d at 59 (quoting Restatement § 145).[12]  Other courts applying § 145 of the Restatement routinely look to all the factors. *See AT&T Mobility*, 707 F.3d at 1112 n.11; *In re Flonase Antitrust Litig.*, 815 F. Supp. 2d 867, 882-83 (E.D. Pa. 2011).[13]

The crux of Indirect Purchasers' argument is that Tennessee has a more significant relationship to the litigation than the states where the injury occurred. *See Hataway*, 830 S.W.2d at 60 (applying Tennessee law even though the injury occurred in Arkansas).  Indirect Purchasers argue the conduct here "centered in" Tennessee and the purpose of the TTPA is to protect the state's trade or commerce from being affected by anticompetitive conduct.  Indirect Purchasers describe the place of injury as "fortuitous."

Indirect Purchasers' position is off-base.  The place of the injury is, of course, the starting

---

[12] Section 145 states "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state, which with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Section 6 lists the following considerations:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

[13] There is no reason to think the unjust enrichment and unfair trade practices claims would be different.  In fact, the Sixth Circuit recently applied these considerations to violations of the Tennessee Consumer Protection Act. *Smyrna v. Mun. Gas Auth. of Ga.*, 723 F.3d 640, 646 n.3 (6th Cir. 2013).

55

position. Tennessee traditionally looks to the law of the state where the injury occurred.[14] *Hataway*,

830 S.W.2d at 59. Although this is not *dispositive* it is certainly not "fortuitous." In *Hataway*,

Tennessee law was applied because, although the decedent died at a rock quarry in Arkansas, the

dive took place as a part of a scuba diving class taught at Memphis State University and the parties

were life-long residents of Tennessee. The court held Tennessee had the most significant

relationship with the case regardless of where the injury occurred.

Here, on the other hand, the place of injury is hardly fortuitous. Antitrust class actions,

especially in the pharmaceutical industry, focus on the place the injury occurred, which is where the

plaintiffs were overcharged.[15] In *In re Relafen Antitrust Litigation*, 221 F.R.D. 260 (D. Mass. 2004),

---

[14] Some ambiguity clouds this issue. The language of the Restatement appears to suggest the "default" rule that looks first to the place of injury applies *only* in personal injury and wrongful death cases. *Compare* Restatement (Second) of Conflict of Laws § 145 ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state, which with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."), *with id.* § 146 ("In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."), *and id.* § 175 (including similar language in the context of wrongful death). However, the court in *Hataway* appeared to apply this "default" to all cases, *Hataway*, 830 S.W.3d at 59 ("The Restatement provides that the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."), and subsequent courts have applied it similarly, *see In re Bridgestone/Firestone*, 138 S.W.3d 202, 208 (Tenn. Ct. App. 2003) ("Tennessee's tenuous links to the litigation are simply insufficient to overcome the default rule that Mexico, as the situs of the accidents at issue, will provide the applicable law."). The Sixth Circuit has relied upon both interpretations at different times. *Compare Montgomery*, 580 F.3d at 459, *with Smyrna*, 723 F.3d at 646 n.3. For the purposes of this case, the Court will assume there is no default presumption that the place of injury controls. Regardless, the Court concludes Tennessee's law does not apply to a nationwide class.

[15] Indirect Purchasers provide relatively little argument regarding their unjust enrichment claim and whether a choice-of-laws analysis is necessary there. This is particularly surprising because Indirect Purchasers conceded such an analysis would be called for during the motion to dismiss briefing. Regardless, Indirect Purchasers' unjust enrichment claim is analyzed similar to

56

the court responded to a similar argument that it should simply apply Pennsylvania law class-wide because the defendant was based there. Looking to the most "significant contact," which was the place of injury, the court noted many if not most of the relevant sales occurred outside Pennsylvania between wholesalers and indirect purchasers. *Id.* at 277. "Applying Pennsylvania law to these wholly out-of-state transactions would be at best a 'novelty,' and at worst a violation of constitutional limitations." *Id.* (citing *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) (stating that under federal constitutional limits, "[a] state cannot regulate sales that take place wholly outside it")).

Beyond Indirect Purchasers' argument that they have identified more significant contacts with Tennessee than did the plaintiffs in *Relafen*, one primary distinction between that case and this one persists: in *Relafen* the court (as have many other courts) recognized that antitrust and consumer protection laws typically aim to compensate consumers rather than police corporate conduct. *Relafen*, 221 F.R.D. at 277. Other courts have made similar observations. *See In re Flonase*, 815 F. Supp. 2d at 883 ("The state laws at issue here are intended to protect consumers from being overcharged. The purchase states have a serious interest in applying their law to allow consumers (or in this case, the Plans covering the consumers) to recover the money that they were overcharged in a transaction occurring in their states."); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 135-36 (E.D. Pa. 2011) ("The statutory language of the laws at issue here contain no prohibitions that would indicate that a state has a policy of only covering transactions that involve in-state citizens,

---

their TTPA claim. Indirect Purchasers have pleaded this claim as an alternative to their antitrust claim and it relies upon the same theory (Court File No. 200, Motion to Dismiss Order, p. 47) ("[B]oth Plaintiffs have stated they are asserting their unjust enrichment claims as an alternative equitable remedy to their legal claims."). The interests of the states discussed herein would mirror those in consideration of the antitrust claims.

rather than in-state transactions."). "The home states' corresponding interest in preventing the Plans from recovering for an overcharge located in a separate state is simply not as substantial." *In re Flonase*, 815 F. Supp. 2d at 884.

But here, as discussed above, Tennessee courts have recognized that "the purpose of the TTPA is to protect the state's trade or commerce affected by the anticompetitive conduct."[16] *Freeman*, 172 S.W.3d at 522. However, the purpose of allowing an *indirect purchaser* to sue is "to protect and afford a remedy to ultimate consumers." *Freeman*, 172 S.W.3d at 517. Thus to the extent the broader purpose of the TTPA may include protecting Tennessee's market, the purpose of allowing plaintiffs such as those in the proposed class to sue is to protect the individual plaintiffs. The TTPA's purpose, therefore, also weighs in favor of choosing the law of the state in which the individual plaintiffs were injured.

Moreover, the Tennessee Supreme Court has clarified the broader purpose of the TTPA as composed of two components: "to preserve full and free competition in the sale of merchandise that 'had become a part of the mass of property in the State,'" and "'to preserve full and free competition in the manufacture and sale of 'articles of domestic growth and domestic raw material' and to prevent combinations tending to affect the price or cost of these articles to the producer or consumer.'" *Id.* Thus the TTPA is focused on both the manufacture *and sale* of product in the State. But the proposed class in this case is defined specifically to exclude any plaintiffs who operated a

_____

[16] Defendants claim this is an inappropriate consideration. Contrary to Defendants' argument, the Restatement focuses on the policies of the forum state as well as the field of law. *See* Restatement (Second) § 145.

business in Tennessee; the *only state* the Indirect Purchasers do not represent is Tennessee.[17] Inconsistent with Indirect Purchasers' argument, the proposed class does not appear to effect the purpose of the TTPA.

The place of domicile of the parties and the place where the conduct occurred is relevant, to be sure. But only one of the alleged conspirators here is headquartered in Tennessee. Where "plaintiffs complain about the conduct of companies located in separate States . . . , diluting the interest of any one State in regulating the source of the harm yet in no way minimizing the interest of each consumer's State in regulating the harm that occurred to its residents," basing the choice-of-law on the defendant's headquarters is likely inappropriate. *Pilgrim*, 660 F.3d at 946-47. King manufactures Skelaxin in Tennessee, which may indicate this litigation has a greater relationship to Tennessee than to Pennsylvania (Mutual's principal place of business). But given the purpose of the TTPA, Tennessee's interest here is markedly lower than the states where the injury occurred. In this context, it is difficult to see how Tennessee has a more significant relationship to the litigation than the state where the injury occurred, which Indirect Purchasers concede is not Tennessee.

And in *Pilgrim* the court questioned the application of one state's consumer protection laws to a nationwide class, fearing it would permit companies to avoid tough consumer protection laws and it would conflict with the intent of such laws. *Id.* at 947. As discussed above, although Indirect Purchasers argue the intent behind antitrust and consumer protection laws are different, the intent behind the TTPA and allowing indirect purchasers to sue indicates the place of injury is the

---

[17] Based on the wording, though, it is possible some entities may have *purchased* in Tennessee but operate a business outside the state. Indirect Purchasers have not, however, identified any such entity.

appropriate choice-of-law here. And the *Pilgrim* court's concern about picking advantageous state laws is equally applicable here, if not more so: whereas every state has some sort of consumer protection law, not every state allows indirect purchasers to sue for anticompetitive conduct.

Accordingly, the Court concludes it must apply the law of the state where the injury occurred, not Tennessee's. Indirect purchasers, however, only alleged Tennessee state law causes of action for the nationwide class.

### iii. Conflict of Law

Given the burden here is squarely on Indirect Purchasers and they have made no attempt to save this nationwide class if the Court concludes Tennessee law does not apply nationwide, the Court declines to certify the nationwide class and will therefore consider the four state subclasses. In fact, Indirect Purchaser's amended complaint suggests they do not seek certification of a nationwide class unless the Court concludes Tennessee law may apply to such a class (Court File No. 204, Amended Complaint, ¶ 308) ("The Indirect Purchaser for Resale Plaintiffs allege this claim in the alternative in the event the Court does not apply Tennessee law on a nationwide basis or certify a nationwide class."); (*see also id.* ¶¶ 315, 321, 330, 338, 344).

Even if the Court were to engage in an extensive conflict-of-law analysis on its own accord, the Court would still reject this class. Given Indirect Purchasers seek to certify a class of entities and individuals in all states but Tennessee, the Court would be forced to apply the law of forty-nine states (and territories). Applying the law of forty-nine states likely renders this class simply unmanageable. "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Pilgrim*, 660 F.3d at 948-49 (quoting in parenthetical *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)). Where a court "certifie[s] a nationwide class . . .

60

, [i]f more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, . . . [and] class certification would not be the appropriate course of action." *In re Am. Med.*, 75 F.3d at 1085. "Accordingly, a district court must consider how variations in state law affect predominance and superiority." *Castano*, 84 F.3d at 741.

The antitrust laws of many states differ markedly. For instance, although the court in *Relafen* acknowledged similarities between a number of states[18] that allow indirect purchaser antitrust claims and unjust enrichment claims, the court noted that the laws of a number of the states varied enough to counsel against certification. *Relafen*, 221 F.R.D. at 279-80. The court noted that some states require proof of actual injury whereas others do not. The court thus omitted the states of Florida, Maine, Minnesota, and Michigan from the class. The court also omitted Tennessee from the antitrust claims but not from the unjust enrichment claims. All said, the court settled on a class composed of Arizona, California, Massachusetts, and Vermont for both antitrust and unjust enrichment, and added Tennessee to the unjust enrichment class.

Moreover, if the class were nationwide, many of the states involved here do not allow indirect purchasers to sue. In the least, the court would have to amend the definition to omit those states. And unjust enrichment claims, which Indirect Purchasers hardly discuss at all, vary state-by-state. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) ("The elements necessary to establish a claim for unjust enrichment also vary materially from state to state.") (citing Candace S. Kovacic, A Proposal to Simplify Quantum Meruit Litigation, 35 Am. U. L. Rev. 547, 558–60 (1986)).

---

[18] Considering the laws of Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, New York, North Carolina, Tennessee, and Vermont.

The burden here is on Indirect Purchasers and they have made little effort to salvage this class were the Court to conclude Tennessee law does not apply nationwide. In fact, they appear not to seek certification of such a class pursuant to the laws of forty-nine states (and territories). The Court thus declines to carve out an acceptable alternative.

### 4. State Subclasses

### i. Choice of Law

Defendants argue the state subclasses fail as well because they are focused on entities (or individuals) that operate businesses in the subclass states, whereas the choice-of-law rules dictate that the state where the *injury* occurred should govern. Where the entity operated its business is irrelevant; what matters is where the entity *purchased* the Skelaxin because that is where it was overcharged. Unlike the End Payors, who were overcharged in the final purchase of Skelaxin to the individual patients, Indirect Purchasers were injured when they purchased the drug from a wholesaler. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07–1827 SI, C 11–0058 SI, 2011 WL 3809767, at *3-4 (N.D. Cal. Aug. 29, 2011) (concluding that the state where the supracompetitively priced product was purchased and not where it was resold controls under the § 145 Conflict of Laws analysis). Otherwise, large pharmacies would have claims in nearly all states because they operate a business in each state. But identifying which of the proposed class members actually "purchased" the Skelaxin in which state would require individualized inquiries not appropriate for class certification.

Indirect Purchasers do not substantively respond on this issue. They frame the "only argument" against class certification as a "damages allocation" argument. They have made no attempt to discuss the choice-of-law issue for the state subclasses or explain their theory. This is

62

notable because it is Indirect Purchasers' burden to establish that class certification is appropriate. Without argument or evidence on this point, it seems to the Court that class certification would be inappropriate. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004) ("The plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various laws have not been identified and compared."). Indirect Purchasers primarily placed their eggs in the nationwide-Tennessee-law basket and gave this issue short shrift.

As Defendants correctly argue, the state where the Skelaxin was purchased governs Indirect Purchasers' claims. *See, e.g.*, *In re Flonase*, 815 F. Supp. 2d at 883-84 ("The alleged injury central to each of Indirect Purchaser Plaintiffs' state law claims is an overcharge for Flonase purchases in the purchase states that were either made by or reimbursed by the Plans."). "The state laws at issue here are intended to protect consumers from being overcharged. The purchase states have a serious interest in applying their law to allow consumers . . . to recover the money that they were overcharged in a transaction occurring in their states." *Id.*; *Wellbutrin XL*, 282 F.R.D. at 135-36 ("The statutory language of the laws at issue here contain no prohibitions that would indicate that a state has a policy of only covering transactions that involve in-state citizens, rather than in-state transactions."). Although most indirect purchaser cases focus on end-consumer classes composed of individuals and TPPs, rather than the pharmacy-middlemen class Indirect Purchasers have asserted, the interest of the state in which the purchase occurred still outweighs the interest of any other state. The injury occurred there and the multitude of other states who may claim some involvement in the transaction (the plaintiff's home state, each defendant's home state) dissipates any one other state's interest. *See Pilgrim*, 660 F.3d at 946-47 ("[P]laintiffs complain about the conduct of companies located in separate States . . . , diluting the interest of any one State in

regulating the source of the harm yet in no way minimizing the interest of each consumer's State in regulating the harm that occurred to its residents."). And Indirect Purchasers, as noted, have not offered any basis on which the Court could decide otherwise.[19]

Even were the Court to attempt to rectify some of these issues, other problems arise. For instance, the Court could alter the language of the class definition to include only those companies that *purchased* the Skelaxin in the subclass states. But this is problematic as well because there is no proof to suggest any of the named plaintiffs purchased Skelaxin in these states. *See In re Panacryl Sutures Prods. Liability Cases*, 263 F.R.D. 312, 322 (E.D.N.C. 2009) ("[B]ecause Plaintiffs have not shown that the prospective class representatives' claims will take into account the substantive laws governing every class member, this Court's conclusion that the laws of the prospective class members' home jurisdictions will govern their claims precludes a finding of typicality."). The named plaintiffs may only have claims in states that do not recognize indirect purchaser actions or in states where the consumer protection law and unjust enrichment standards conflict with the law of the subclass states. The Court simply has no way of knowing in light of Indirect Purchasers' failure to discuss this issue. It may be the case that the named plaintiffs did purchase Skelaxin in these states, but Indirect Purchasers have not indicated as much and have pointed to nothing in the voluminous record before the Court that demonstrates this fact.[20]

---

[19] Although they did note that Defendants have adopted conflicting theories in response to End Payors' and Indirect Purchasers' motions (Court File No. 338, p. 35 n.44), this does not contend with the substance of the argument.

[20] Indirect Purchasers offer affidavits of representatives of each named plaintiff indicating that it operates a business in one of the subclass states and that it purchased Skelaxin on multiple occasions (Court File Nos. 158-1, 158-2, 158-3, 202). Each individual indicates from whom the entity purchased Skelaxin but not where it did so.

Moreover, the damages and impact analyses performed by Dr. Lamb compute damages for the class in two unsatisfactory ways: first by computing aggregate damages and apportioning them by state based on where the prescription was dispensed, and second by apportioning them by state based on the headquarters of the pharmacies (Court File No. 161, Lamb Decl., ¶ 88); (Court File No. 338-7, Lamb Reply Decl., ¶¶ 34-37). Neither of these methods would be consistent with the class definition were the Court to alter it to correctly rely on the state where the Skelaxin was purchased by Indirect Purchasers.

For these reasons, the Court concludes Indirect Purchasers have failed to meet their burden on a motion for class certification. The Court will **DENY** Indirect Purchasers' motion.

### C. Motion for Partial Summary Judgment and Motion to Strike

End Payors also filed a motion for partial summary judgment and a motion to strike Defendants's expert reports and testimony. End Payors' motions consider Defendants' proffered "pass on" defense. However, End Payors' motions are relevant to the putative class and rely upon broad-based arguments relevant to such a class. The Court, however, has denied End Payors' motion for class certification. Accordingly, the Court will **DENY WITHOUT PREJUDICE** these motions. Individual End Payor plaintiffs may raise this issue in future dispositive motions relying upon evidence and the state law relevant to that particular plaintiff.

## IV.  CONCLUSION

For the foregoing reasons, the Court will **DENY** both End Payors' and Indirect Purchasers' motions for class certification (Court File Nos. 158, 167). Additionally, the Court will **DENY WITHOUT PREJUDICE** End Payors' motion for partial summary judgment (Court File No. 356) and motion to strike Defendants' expert reports and testimony (Court File No. 354).

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**