UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

In re:                                               ) Case No. 1:12-md-2343
                                                     )
Skelaxin (Metaxalone) Antitrust Litigation           ) Judge Curtis L. Collier

## **M E M O R A N D U M**

Before the Court are a number of motions in limine filed by the parties in preparation for an upcoming damages trial. For the reasons discussed below, the Court rules as follows.

Plaintiffs move to preclude Defendant from offering evidence regarding generic bypass, reduced volumes of sales based on hypothetical reduced promotional expenses, and "undercharges" or "negative damages." Because the Court agrees with Plaintiffs that Supreme Court precedent precludes Defendant from relying on this evidence, the Court will **GRANT** Plaintiffs' motion (Court File No. 584).

Defendant filed four motions in limine of its own. The first relates to a scenario that Plaintiffs will not pursue in light of the court's ruling on Plaintiffs' motion in limine. The Court therefore will **DENY** as **MOOT** Defendant's first motion in limine (Court File No. 596).

In Defendant's second and third motions in limine, it moves the Court to preclude Plaintiff from seeking so-called "umbrella" damages, or "generic overcharge" damages. The Court agrees with Defendant that Plaintiffs lack standing to seek those damages and will **GRANT** Defendant's second motion in limine (Court File No. 598). Accordingly, Defendant's third motion in limine, which offers an alternative basis for excluding a portion of those damages, will be **DENIED** as **MOOT** (Court File No. 600).

Finally, Defendant's fourth motion in limine seeks exclusion of evidence or argument regarding liability issues. Because the Court is not yet in a position to rule on such a motion, the

Court will **RESERVE RULING** on Defendant's fourth motion in limine (Court File Nos. 591, 602).

I.      PLAINTIFFS' MOTION IN LIMINE

Plaintiffs move to exclude the opinion of Defendant's expert, Daniel Rubinfield, on three issues: (1) whether damages should be reduced as a result of so-called "generic bypass"; (2) whether overcharges should be calculated based on the quantity of actual purchases of metaxalone or hypothetical quantities; and (3) whether Plaintiff's damages should include deductions for "undercharges" or "negative damages."

Although these are three separate issues they all derive from essentially one dispute: the extent to which the realities of the market should affect Plaintiffs' recovery. The parties agree that pharmacies and other entities purchased branded Skelaxin through wholesalers but would purchase generic metaxalone directly from generic manufacturers rather than wholesalers. Thus the parties agree that–but for Defendant's allegedly anticompetitive conduct–pharmacies would have purchased fewer units of Skelaxin from direct purchasers and would have purchased more metaxalone from generic manufacturers. This is called "generic bypass" because the purchaser bypasses the branded Skelaxin for the generic alternative. Additionally, when a generic alternative to a brand drug enters the market, the manufacturer of the branded drug generally will reduce promotional expenses. Because in the but-for world Defendant would have advertised Skelaxin less than it actually did, it is likely that fewer Skelaxin units would have been purchased from wholesalers who would have purchased fewer themselves in turn.

Based on these theories, Defendant's expert would testify to a much lower level of damages than Plaintiffs' expert. Defendant offers a simple example. If direct purchasers purchased 100 units

2

of Skelaxin, and in the but-for world they would have purchased only 50 units of generic metaxalone, then direct purchasers are only entitled to the difference between the 50 units of Skelaxin and the 50 units of generic metaxalone. The additional 50 units, according to Defendants, should not be considered in the damages calculation. Although the direct purchasers in fact purchased the additional 50 units, Defendant argues there is no overcharge injury to compensate because the direct purchasers simply would not have purchased those additional units. In fact, direct purchasers benefitted from the supracompetitve price because they made additional sales and profits they would not have otherwise made.

Understanding the dispute between the parties requires an analysis and examination of Supreme Court precedent. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), a shoe manufacturer sued a lessor of shoe manufacturing machinery for monopolizing the industry in violation of § 2 of the Sherman Act. The plaintiff claimed the defendant's practice of leasing and refusing to sell certain major machines was part of its larger monopolization efforts and the plaintiff sought damages in the form of overcharges—that is, the difference between what it paid to lease the machinery during the relevant time period versus what it would have paid had the defendant been willing to sell the machinery. *Id.* at 483-84. The defendant, however, argued the plaintiff suffered no legally cognizable injury because the cost of machines was reflected in the plaintiff's shoe prices and had he been charged less for machinery he would have decreased the price of his shoes and made no more profit. *Id.* at 487-88.

The Supreme Court rejected this "pass-on" defense. The Court noted first that a buyer who purchases an overpriced product and absorbs the loss is clearly entitled to damages. So too, the Court noted, is a buyer who purchases the illegally priced product and maintains his price but takes

3

steps to either sell more product or reduce other costs and as such makes the same amount of profit:

> We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

*Id.* at 489. The defendant further argued that a buyer suffers no loss "where the overcharge is imposed equally on all of a buyer's competitors and where the demand for the buyer's product is so inelastic that the buyer and his competitors could all increase their prices by the amount of the cost increase without suffering a consequent decline in sales." *Id.* at 492. But the Court was "not impressed with the argument that sound laws of economics require recognizing this defense." *Id.* Because any number of factors influence the pricing policies of a business, pinpointing how the business would have priced the product without the anticompetitive conduct was difficult if not impossible. Moreover, even if this could be shown, "there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued." *Id.* at 493. Establishing the defense would be difficult to demonstrate—perhaps "insurmountable"— and antitrust defendants would "frequently seek to establish its applicability." *Id.*

The Court also noted that the pass-on defense conflicted with the basic principles of antitrust law. Because those buyers subjected to the passing-on defense would have passed on the damage to their customers, who would have a tiny stake in the lawsuit and little interest in class participation, "those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be

4

substantially reduced in effectiveness." *Id.* at 494. Accordingly, the Court concluded the pass-on defense was inapplicable.

A number of years later, the Court was moved to consider the application of *Hanover Shoe* to indirect purchasers. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the State of Illinois and seven hundred local government entities brought an antitrust action against companies that manufactured and distributed concrete block. The companies sold primarily to masonry contractors who submitted bids to general contractors who, in turn, submitted bids on public contracts to the plaintiffs. The plaintiffs alleged the defendants combined and conspired to fix the prices of concrete block, which caused the plaintiffs to spend some $3 million more than they otherwise would. The plaintiffs, however, had to rely on the theory that the overcharge passed on to them through the direct purchasers, the masonry and general contractors. The defendants argued that only the direct purchasers could sue for the alleged overcharge and indirect purchasers such as the plaintiffs could not.

The Supreme Court agreed with the defendants and held that indirect purchasers may not rely on an offensive pass-on theory. The Court, relying on *Hanover Shoe*, concluded "allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants." *Id.* at 730. The direct purchaser could sue for full recovery and then the indirect purchasers could sue for the same amount. The Court stated it was unwilling to "open the door" to duplicative recoveries. *Id.* at 731. Moreover, the reasoning underlying *Hanover Shoe* applies less forcefully in the indirect purchaser context:

> The principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions "in the real economic world rather than an economist's hypothetical model," 392 U.S., at 493, 88 S.Ct., at 2231 and of the costs to the judicial system and the efficient enforcement

5

of the antitrust laws of attempting to reconstruct those decisions in the courtroom. *Id.* at 731-32. This reasoning "applies with no less force to the assertion of pass-on theories by plaintiffs" than in the defensive context, and the problems associated with the defensive theory would be as burdensome in the plaintiff context, maybe worse. *Id.* at 732. And preventing indirect purchasers from bringing a pass-on claim does not allow violators to enjoy "the fruits of their illegality" because "*Hanover Shoe* . . . rest[ed] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id.* at 734-35.

The Court, faced with choosing whether to limit the holding of *Hanover Shoe* or to preclude indirect purchasers from pursuing a pass-on theory, chose the latter. The Court noted, as discussed above, the problems courts would face with determining "the relevant market variables." *Id.* at 743. Moreover, although some courts and commentators advised carve-outs in certain contexts, the Court declined to make exceptions to the *Hanover Shoe* rule. The Court finally concluded "the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4, is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." *Id.* at 746 (citation omitted).

**A. Generic Bypass**

The Court is not the first to consider whether *Hanover Shoe* and its progeny preclude an antitrust defendant from asserting a theory based upon generic bypass. The court in *In re Relafen*

6

*Antitrust Litig.*, 346 F. Supp. 2d 349 (D. Mass. 2004) also considered this question in a similar case.[1]

In *Relafen*, the plaintiffs were, as Plaintiffs are in this case, pharmacies who did not buy directly from manufacturers. *Id.* at 368. However, the plaintiffs in both *Relafen* and in this case obtained the rights of national wholesalers by assignment and are thus pursuing direct purchaser claims.[2] The defendant in *Relafen* argued, however, that "while manufacturers of branded drugs typically sell the majority of their products through pharmaceutical wholesalers, the manufacturers of generic drugs often bypass such wholesalers and sell directly to retail stores, HMOs, hospitals, and other customers." *Id.* at 369 (internal quotation marks and alteration omitted). Just as Defendant argues here, the defendant in *Relafen* contended that damages must be reduced to account for this phenomenon.

The *Relafen* court disagreed and concluded that accounting for generic bypass in the damages assessment would be inconsistent with *Hanover Shoe*. *Id.* Characterizing the defendant's argument as an "otherwise benefitting" defense—as in, otherwise benefitting from the anticompetitive conduct and adjusting damages accordingly—the court concluded that, "as *Illinois Brick* makes clear, *Hanover Shoe* permits a direct purchaser to recover the 'full amount of the overcharge,' even if he is otherwise benefited." *Id.* (internal citation omitted) (quoting *Illinois Brick*,

---

[1] Defendant heavily relies on *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297 (E.D. Mich 2001). The court in *Cardizem* concluded that the generic bypass issue did not preclude class certification. After so concluding, the court noted that the plaintiffs would be required to account for "the by-pass phenomenon" when presenting its case to the jury. *Id.* at 317. Based upon this Court's understanding of *Hanover Shoe* and *Illinois Brick*, the Court is unable to agree with this decision reached in Cardizem and must respectfully decline to follow *Cardizem* as did the court in *Relafen*. *See Relafen*, 346 F. Supp. 2d at 368 n.11 ("Respectfully, this Court did not consider *Cardizem* conclusive.").

[2] Also as in *Relafen*, Plaintiffs have indicated their desire to opt out of the direct purchaser settlement class.

7

431 U.S. at 730). The court also noted that the defendant's argument would result in no recovery for *any* plaintiff for the "bypassed" units: "[W]holesalers could not recover the bypass overcharges, because wholesalers would not have purchased the generic drug in the 'but for' world. Nor could retailers recover the bypass overcharges, because retailers were not direct purchasers of the branded drug in the actual world." *Id.* (internal citations omitted). Thus the generic bypass defense would leave "a substantial portion of the harm . . . completely unredressed." *Id.* This result is simply incompatible with the underlying purpose of the Sherman Act as well as the Supreme Court's intent in *Hanover Shoe*:

> [T]he antitrust laws create a system that, to the extent possible, permits recovery in rough proportion to the actual harm a defendant's unlawful conduct causes in the market without complex damage apportionment. This scheme at times favors plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick*), but it never operates entirely to preclude market recovery for an injury.

*Id.* at 370 (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483 (7th Cir. 2002)).

The Court agrees with this analysis. As the Supreme Court stated in *Illinois Brick*, "the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4, is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." 431 U.S. at 746. The antitrust laws are focused on divesting bad actors of their ill-gotten gains, not on compensating victims. Defendant's theory would leave a significant amount of the overcharge in the hands of the antitrust violator.

Defendant attempts at length to limit *Hanover Shoe*. Defendant argues that *Hanover Shoe* only precludes a defendant from showing that a plaintiff took steps in the *actual* world to insulate it from suffering injury. A defendant cannot, for instance, offer evidence that a plaintiff adjusts its

8

prices to maintain a consistent profit margin, passing on any increase input cost to its customers. In this case, on the other hand, Defendant seeks to introduce evidence of the *hypothetical* world. That is, Defendant argues not that Plaintiffs took any steps to pass on the overcharge, but that Plaintiffs did not actually incur some of the overcharge for which they now seek compensation.

Defendant ignores the fundamental import of *Hanover Shoe* and its progeny: "a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust 'injury occurs and is complete when the defendant sells at the illegally high price.'" *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 304 (D.D.C. 2007) (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 313 (E.D. Mich. 2001)); *see also id* ("As such, Defendants' arguments that the Big Three actually benefitted from the delayed entry of Balziva into the market due to the generic bypass phenomenon are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between Plaintiffs' interests and those of the Big Three with respect to this litigation."). That is, the focus of the antitrust laws is limited to the anticompetitive sale. When Defendant sold the Skelaxin to the wholesalers at an allegedly anticompetitive price, the injury was complete. The jury need not hear any more. True, to calculate damages the jury must consider what the cost of the drug would have been in the absence of an antitrust violation. But *Hanover Shoe* and *Illinois Brick* make clear that courts and juries will not be forced down the rabbit hole of hypothetical issues antitrust violators may raise to minimize their liability.

Further, *Illinois Brick* made clear that "*Hanover Shoe* . . . rest[ed] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." 431 U.S. at 734-35. In keeping with

9

this principle, the Supreme Court precluded indirect purchasers from obtaining compensation for their injuries even if everyone agreed that the indirect purchasers actually suffered the harm. Under Defendant's theory, there would never be full recovery of the overcharge. Rather, a significant portion of the overcharge would go "unredressed" by federal antitrust law, as the *Relafen* court put it. Defendant argues vigorously that Supreme Court precedent does not stand for the proposition that direct purchasers should receive a windfall, that is, compensation for an injury they likely did not suffer. But, contrary to Defendant's argument, *Illinois Brick* suggests just that: the antitrust laws are much more concerned with fully divesting antitrust violators of the benefit of their violation than with any potential windfall to plaintiffs.

Nor is the Court convinced that state laws providing other avenues for plaintiffs to seek compensation rectifies this issue. As the court concluded in *Relafen*, "[t]he remedies available under state law . . . 'cannot and do not purport to affect remedies available under federal law.'" 346 F. Supp. 2d at 370 (quoting *California v. ARC America Corp.*, 490 U.S. 93, 103 (1989)). *Hanover Shoe* and *Illinois Brick* consider the principles of *federal* law, not state law, and Defendant's theory is no more supported by the possible existence of other sources of compensation for plaintiffs than is any defendant who violates a federal law with redundancies at the state and local level.

### B. Reduced Promotion

The same must be said for Defendant's promotional evidence. Defendant seeks to introduce testimony demonstrating that it would have spent less on promotional advertising for Skelaxin had a generic alternative entered the market and thus Plaintiffs would have sold fewer units. Again, for the reasons discussed above, the injury was complete at the time the wholesalers purchased the Skelaxin from Defendant.

10

### C. Overcharges and Undercharges

Finally, Defendant also proposes to minimize Plaintiffs' damages by adjusting the amount the wholesalers would have purchased in one of its damages scenarios. Defendant's second damages scenario proposes that a generic alternative would have been available from July to October 2008 and not thereafter. A generic alternative actually entered the market in April 2010. Defendant, however, proposes that the jury compute damages as if a generic did not enter the market until 2012.

Defendant does not dispute that this case is not the sort in which "net" injury or damage "offsets" are appropriate. *See, e.g.*, *Perma-Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134 (1968); *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356 (9th Cir. 1986). Indeed, Defendant does not cite a case in support of its theory. Rather, Defendant simply argues that Scenario 2 would have resulted in a less competitive market than the actual world and the jury should be able to account for that in a potential damages calculation. However, as noted above, the injury here was complete when the wholesalers paid the inflated price. The overcharge damage is what the wholesalers paid for the supracompetitively priced Skelaxin less what they would have paid for a generic alternative. Any degree to which the wholesalers may have benefitted from the conduct is not to be taken into account.

### D. Conclusion

For the foregoing reasons, the Court will **GRANT** Plaintiffs' motion in limine (Court File No. 584).

## II. DEFENDANT'S FIRST MOTION IN LIMINE

11

In Defendant's first motion in limine it seeks to preclude Plaintiffs from introducing evidence regarding indirect purchases of Skelaxin. Plaintiffs indicate that, if the Court rules that Defendant may not introduce evidence regarding generic bypass, Plaintiffs will not seek to introduce evidence regarding indirect purchases of Skelaxin. Accordingly, because the Court grants Plaintiffs' motion in limine, it will **DENY** Defendant's first motion in limine as **MOOT** (Court File No. 596).

### III. DEFENDANT'S SECOND MOTION IN LIMINE

Defendant's second motion in limine pertains to so-called generic-overcharge damages. Plaintiffs seek to recover for overcharges incurred through purchases of generic metaxalone from generic manufacturers. The theory behind Plaintiffs' entitlement to such damages is fairly simple: because there were fewer generic manufacturers on the market as a result of Defendant's conduct, the price for generic metaxalone was artificially high.

Defendant describes these damages as "umbrella damages." "The umbrella theory is essentially a consequential damages theory. It seeks to hold price-fixers liable for harm allegedly flowing from the illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions." *In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339 (9th Cir. 1982). Defendant argues that Plaintiffs lack standing to pursue such damages.

As Defendant notes, some courts reject "umbrella" damage theories as a matter of law. In *FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25, 38-39 (D.D.C. 1999), the court focused on two

12

circuit decisions in reaching this conclusion.³ In *Mid–West Paper Products Co. v. Continental Group Inc.*, 596 F.2d 573, 584 (3d Cir. 1979), the Third Circuit noted that damages under an umbrella theory are "highly conjectural" because "it cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge." The determinations required to answer these questions would inevitably conflict with the Supreme Court's mandate in *Hanover Shoe* and *Illinois Brick* that antitrust cases not become embroiled in "complex economic proceeding[s]." *Id.* at 585 ("Apart from its speculative nature, any attempt to determine the effect of defendants' overcharges upon their competitors' prices would transform this antitrust litigation into the sort of complex economic proceeding that the *Illinois Brick* Court was desirous of avoiding if at all possible.").

The *Mylan Laboratories* court also relied upon the Ninth Circuit's decision in *In re Petroleum Products*. In *Petroleum Products*, the court rejected the use of the "umbrella" theory because it may result in double recovery against defendants. On the facts of that case, "the overcharge to plaintiffs may simply result from a pass-on of the original unlawfully inflated price." 691 F.2d at 1340. This risk of double recovery "falls squarely within *Illinois Brick*" and the court therefore rejected the claims. *Id.* Moreover, "wholly apart" from the risk of double recovery, the plaintiff's claims were "unacceptably speculative and complex." *Id.* at 1340-41.

---

³ Another circuit case, *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1166 n.24 (5th Cir. 1979), suggested in a footnote that umbrella damages satisfy proximate causation. This holding has been called into doubt by later courts. *See In re Vitamins Antitrust Litig.*, MDL NO. 1285, 99CIV5134, 2001 WL 855463, at *4 (D.D.C. June 2, 2001) (noting that the *Beef Industry* court relied on the "target area" standing test later rejected by the Supreme Court in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537-45 (1983) and that "[t]he overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after *Associated General* have rejected 'umbrella' claims").

Considering these cases, the *Mylan Laboratories* court noted that "[t]he main difficulty with the umbrella theory is that, even in the context of a single level of distribution, ascertaining the appropriate measure of damages is a highly speculative endeavor." 62 F. Supp. 2d at 39. Given the "numerous pricing variables" the court would be called to consider, "including the cost of production, marketing strategy, elasticity of demand, and the price of comparable items (i.e. the brand versions of lorazepam and clorazepate)," the theory "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings." *Id.* (quoting *Illinois Brick*, 431 U.S. at 732).

Other courts have rejected "umbrella" claims as inconsistent with *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519 (1983). Following *AGC*, which was decided after both *Mid-West Paper* and *Petroleum Products*, district courts balance five factors in determining whether a plaintiff has established antitrust standing:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012) (quoting *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir.1983) (citing *AGC*, 459 U.S. at 537-45)). "[T]he overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after [*AGC*] have rejected 'umbrella' claims." *In re Vitamins Antitrust Litig.*, MDL NO. 1285, 99CIV5134, 2001 WL 855463, at *4 (D.D.C. June 2, 2001). Those cases rejecting "umbrella" claims under the *AGC* approach typically do so because "umbrella claims

14

are simply too remote to confer antitrust standing." *Id.*; *see also In re Online DVD Rental Antitrust Litig.*, No. M 09–2029 PJH, 2011 WL 1629663, at *7 (N.D. Cal. April 29, 2011) ("[P]laintiffs' theory of a causal link—i.e., that Netflix pricing, by virtue of Netflix's status as the dominant player in the online DVD rental market, constituted a 'maximum' ceiling that dictated Blockbuster's pricing—is simply too attenuated to be considered sufficiently direct."); *Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*, 116 F. Supp. 2d 1159, 1168 (C.D. Cal. 2000) ("The causative links between Defendants' alleged conduct and injuries allegedly suffered by Plaintiffs are simply too attenuated, and the Court finds a substantial risk of duplicative recovery, as the Plaintiffs now before the Court are only tangentially affected.").

Plaintiffs argue, on the other hand, that the damages at issue here are not really "umbrella" damages but rather are "an entirely different phenomenon." According to Plaintiffs, the typical "umbrella" damages case involves the same number of sellers in the market but a higher market price as a result of the defendant's anticompetitive conduct. In this case, Plaintiffs allege the anticompetitive conduct resulted in fewer sellers on the market. Because there is no need to "speculate" about whether or why a non-conspirator firm raised its prices, Plaintiffs suggest the overcharge can be calculated "straightforwardly."

The Court disagrees with Plaintiffs that this case is significantly different from other cases rejecting "umbrella" damages. Plaintiffs are seeking the same sort of damages sought in all of these cases: overcharges due to anticompetitive conduct, that is, *higher prices*. The only distinction drawn here is the reason the prices were inflated. But that introduces the same level of uncertainty and complexity that courts have rejected in similar "umbrella" cases. Specifically, Plaintiffs' theory requires consideration of the reasons underlying pricing decisions of non-conspirators. *See In re*

15

*Vitamins*, 2001 WL 855463, at *4 ("The causal connection between plaintiffs' injury and the alleged conspiracy is necessarily attenuated by significant intervening factors, such as independent pricing decisions of the nonconspiring suppliers of pre-mix."); *see also Petroleum Prods.*, 691 F.2d at 1341 ("Not only would we be required to speculate that plaintiffs were injured solely as the result of umbrella pricing, but also we would be required to sanction complex judicial inquiry into the pricing decisions of sellers remote from plaintiffs."). Regardless of the "well-established correlation," as Plaintiffs phrase it, between fewer generic manufacturers and higher generic prices, the Court concludes the damages sought here are too speculative.

Nor is the Court convinced by Plaintiffs' suggestion that a number of courts allow "umbrella" damages. As noted above, "[t]he overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after [*AGC*] have rejected 'umbrella' claims." *In re Vitamins*, 2001 WL 855463, at *4. The cases Plaintiffs cite are either off-point entirely, *e.g.*, *In re Arizona Dairy Prods. Litig.*, 627 F. Supp. 233, 237 (D. Ariz. 1985) (concluding that *Mid-West Paper* and *Petroleum Prods*. do not apply to cases involving co-conspirators), or preceded the Supreme Court's decision in *AGC*, *e.g.*, *In re Uranium Antitrust Litig.*, 552 F. Supp. 518 (N.D. Ill. 1982). Another case, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), did not definitively decide the issue of "umbrella" damages but dealt with commodities markets, in which there is a more direct causal link between price structures than is present in this case. *See In re Online DVD Rental*, 2011 WL 1629663, at *7-8 (distinguishing *Loeb* because it dealt with the price of copper futures that were "directly linked" by "rigid formulas" to the price of physical copper, whereas the facts before the court did not involve commodities or the sort of direct injury present in "interlinked and interdependent commodities markets"); *see also U.S. Gypsum Co. v. Ind. Gas*

16

*Co., Inc.*, 350 F.3d 623, 627-28 (7th Cir. 2003) (relying on *Loeb* in the natural gas market).

Plaintiffs place significant emphasis on *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993). In that case, the plaintiff alleged the defendant conspired with industry partners to monopolize transportation and handling of iron ore. The alleged conduct involved using cranes to move iron ore from vessels and then loading it onto train cars. Docks without adjacent railroads were thus not competitors in the market. Later technological developments allowed for these non-railroad docks to enter the market and to unload the ore more quickly. In order to prevent this intrusion on the market, the plaintiffs alleged that railroad officials agreed to modify leases with railroad docks as well as to increase prices for inland haulers in order to prevent the intrusion of non-railroad docks in to the iron-ore-transportation market.

The defendants argued the plaintiffs lacked standing to claim damages resulting from the higher cost of shipping via vessel. *Id.* at 1164. Because the higher price was paid to vessel companies, the defendant argued the damages were indirect and precluded under the Third Circuit's prior decision in *Mid-West Paper*, discussed above. The defendants also argued the plaintiffs lacked standing to obtain compensation for the difference between dock handling rates and those that would have been available in the market. Distinguishing *Mid-West Paper*, the court concluded that the plaintiffs had standing to seek these damages. The court observed that "the relevant question" was whether the "antitrust activity directly impacted" the plaintiffs:

> Undeniably it did. The steel companies were the sole customers of the industry involved in the transhipment of ore; indeed, the industry existed for them. True, the steel companies made payments for ore movement services to various parties, defendants and non-defendants alike, but it was unquestionably the steel companies who bore the brunt of the increased costs attributed to the railroad's agreement to thwart development of the less expensive technology.

17

> The direct nature of the injury absorbs the question of causal connection. There are no missing links in the causation chain here. The correlation between the steel companies' inability to utilize the lower cost method to carry its ore and the railroad's attempt to close the ore transport market is obvious. The goal of the railroads in preventing the self-unloader/private dock/private trucking company system from coming into existence left four victims in its wake, the three component industries, and the steel companies. However, the steel companies suffered the greatest harm in connection with the delay of the use of the self-unloader technology. This all-important, directness factor thus weighs greatly in the steel companies' favor.

*Id.* at 1168. Thus the plaintiffs had standing to seek these damages because of the unattenuated link between the defendant's conduct and the damages sought.

This case, however, involves a trickier inquiry: why did two of Defendant's competitors price their generic alternatives as they did? There are any number of possible answers to this question, which is why courts routinely preclude plaintiffs from seeking compensation in these circumstances. *See In re Vitamins*, 2001 WL 855463, at *4 ("The causal connection between plaintiffs' injury and the alleged conspiracy is necessarily attenuated by significant intervening factors, such as independent pricing decisions of the nonconspiring suppliers of pre-mix."). The Court appreciates the argument Plaintiffs raise. Like the plaintiffs in *Lower Lake Erie*, the allegation here is that Defendant prevented a less expensive alternative from entering the market thus maintaining its market dominance. But, unlike *Lower Lake Erie*, the generic prices are not inherently derivative of the anticompetitive conduct. The price of generics are, like in the cases rejecting "umbrella" damages, set by third parties. That generic prices typically rise when there are fewer generic suppliers does not distinguish this case from any other antitrust case in which the laws of supply and demand suggest that anticompetitive conduct will raise prices on a broad scale.

One additional reason counsels against allowing these "umbrella" damages. The Sixth Circuit has indicated that, when performing the *AGC* standing inquiry, courts must consider "the

18

causal connection between the antitrust violation and harm to the plaintiff and *whether that harm was intended to be caused.*" *Static Control Components*, 697 F.3d at 402. In this case, the harm was clearly never intended to be caused. Plaintiffs allege that Defendant sought to preclude generic competitors from reaching market entirely. In other words, Defendant wanted total market control. That a generic was available to Plaintiffs was a failure of that plan, not a goal of it. The generic overcharge was therefore never an intended harm and is further indication that the causal connection between the antitrust violation and Plaintiffs' generic overcharge is too attenuated to allow Plaintiffs to seek these damages.

For these reasons, the Court will **GRANT** Defendant's second motion in limine (Court File No. 598).

### III. DEFENDANT'S THIRD MOTION IN LIMINE

Defendant's third motion in limine relates to specific generic overcharges Defendant sought to exclude on an independent basis from its second motion in limine. Because the Court granted Defendant's second motion in limine, its third motion in limine will be **DENIED** as **MOOT** (Court File No. 600).

### IV. DEFENDANT'S FOURTH MOTION IN LIMINE

Finally, Defendant moves the Court to preclude Plaintiffs from offering any evidence or argument regarding liability issues. Plaintiffs note that, although they understand the focus of the damages trial, there may be appropriate circumstances to note liability issues before the jury. The Court discussed this matter with the parties at some length during its recent management conference.

19

The Court, at this stage, will not wholly preclude the discussion of any particular liability issue. The relevance of such evidence or argument must be addressed in its proper context. Accordingly, the Court will **RESERVE RULING** on Defendant's fourth motion in limine (Court File Nos. 591, 602).

## V. CONCLUSION

For the foregoing reasons, the Court will **GRANT** Plaintiffs' motion in limine (Court File No. 584); will **DENY** as **MOOT** Defendant's first motion in limine (Court File No. 596); will **GRANT** Defendant's second motion in limine (Court File No. 598); will **DENY** as **MOOT** Defendant's third motion in limine (Corut File No. 600); and will **RESERVE RULING** on Defendant's fourth motion in limine (Court File Nos. 591, 602).

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**